FILED
2015 Jun-22  PM 02:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ALESYA M. PASCHAL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-12-S-2985-NE** |
| | ) | |
| **JOHN M. McHUGH,** | ) | |
| ***Secretary of the Army,*** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Alesya M. Paschal, is a General Engineer who is employed by the United States Army's Space & Missile Defense Center located on Redstone Arsenal in Huntsville, Alabama. She asserts a claim for sexual harassment, numerous claims of gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., and a claim of disability discrimination in violation of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq*.[1] All claims are asserted against defendant, John M. McHugh, in his official capacity as Secretary of the United States Army.[2] The case currently is before

---

[1] *See* doc. no. 28 (Third Amended Complaint).

[2] In federal sector employment discrimination cases, the head of the agency that allegedly committed unlawful discrimination "shall be the defendant." 42 U.S.C. § 2000e-16(c). *See also, e.g., Honeycutt v. Long*, 861 F.2d 1346, 1349 (5th Cir. 1988) (holding that head of federal agency was proper defendant in action alleging violation of Title VII); *Canino v. United States Equal Employment Opportunity Commission*, 707 F.2d 468, 472 (11th Cir. 1983) (same).

the court on defendant's motion for summary judgment.[3]

# I.  INTRODUCTION

Before considering the merits of defendant's motion, this court must address the dilemma that was created on January 5, 2015, when the Alabama State Bar placed plaintiff's attorney on "inactive status," and thereby declared that he was "not in good standing."[4]  That action was preceded by the following events.

On November 12, 2014, this court struck plaintiff's initial brief in opposition to defendant's motion for summary judgment for failing to comply with the "Uniform Initial Order" that had been entered shortly after commencement of this action.[5]  That order directed plaintiff to file a brief that complied with the formatting requirements and page limitations of the Uniform Initial Order (*i.e.*, not more than 85 pages) on or before December *3*, 2014.[6]

Plaintiff's counsel did not comply with those directives in any respect.  Instead, on December *5*, 2014, two days late, he filed a motion for permission to submit his

---

[3] Doc. no. 39.

[4] A copy of the State Bar's notice, certifying that plaintiff's attorney had been placed on inactive status with the Alabama State Bar is attached as Exhibit "A."

[5] *See* doc. no. doc. no. 7 (Uniform Initial Order entered on Jan. 18, 2013); doc. no. 53 (Plaintiff's First Response to Summary Judgment); doc. no. 38 (Text Order granting motion for leave to file excess pages); and doc. no. 56 (Order striking plaintiff's first response to summary judgment because it was typed in 12-point font, did not contain either a table of contents or a statement of additional undisputed facts, and was 143 pages in length).

[6] *See* doc. no. 56, at 2.

revised response of time,[7] a motion to exceed the 85-page limit,[8] *and*, *a proposed, 200-page responsive brief*.[9]  (If the three-page "Table of Contents" that was filed with the revised brief as a separate "Exhibit" is counted,[10] the responsive brief actually was 203 pages in length.)  This court struck plaintiff's second attempt at a responsive brief, but allowing her attorney fourteen additional days (until December *22*, 2014) to file a brief that complied with the Uniform Initial Order.[11]

On December *23*, 2014, *one day late*, plaintiff's counsel filed a motion seeking a further extension of time: *i.e.*, "four and one half days until Noon CST to and including December 29, 2014, in which to respond to Defendant's Motion for Summary Judgment."[12]  This court granted that motion by means of a so-called "TEXT ORDER" electronically "stamped" on the case action summary (docket) sheet maintained by the Clerk.[13]

---

[7] *See* doc. no. 57 (Plaintiff's Motion for an Enlargement of Time to Respond to Defendant's Motion for Summary Judgment).

[8] *See* doc. no. 58 (Motion to Exceed Page Limits).

[9] *See* doc. no. 60 ("Paschal's Response in Opposition to Agency Motion for Summary Judgment").

[10] *See* doc. no. 60-1 (Exhibit:  Table of Contents to Brief).

[11] *See* doc. no. 62 (Order), at 3 ("Plaintiff is DIRECTED to file a brief that comports with this court's requirements by December 22, 2014.  Thereafter, defendant will have until January 5, 2015, to file a reply brief.  Plaintiff will not be given any additional attempts to respond to summary judgment if her brief again does not comport with this court's requirements.")

[12] *See* doc. no. 63, at 1.

[13] *See* doc. no. 64 (Text Order).

3

Yet again, however, plaintiff's counsel did not comply with the court's deadline. Instead, *on January 5, 2015*, *seven days late*, he filed a motion seeking *yet another* extension of time, "until Noon CST to and including January 8, 2015," and permission to file a brief containing 125 pages.[14] This court initially was inclined to summarily deny that relief and to consider defendant's motion for summary judgment with no response from plaintiff. But, mindful of the need to give fair consideration to the claims of plaintiff, despite her attorney's failures, this court ultimately granted the motion in both respects, stating that:

> The deadline for plaintiff to respond to defendant's motion for summary judgment is EXTENDED until January 8, 2015. Thereafter, defendant will have until January 22, 2015 to file a reply brief. The page limit for plaintiff's brief is EXTENDED to 125 pages.[15]

Perhaps it will come as no great shock that plaintiff's attorney only partially complied with those requirements. His brief *was* less than 125 pages in length, *but* it was one day late.[16] The most serious problem, however, arose from the fact that the Alabama State Bar had placed him on inactive status four days before.

With the sole exception of attorneys from other jurisdictions who are admitted *pro hac vice*, or individual parties who represent themselves *pro se*, only lawyers who

---

[14] Doc. no. 66.

[15] Doc. no. 68.

[16] *See* doc. no. 69 ("Paschal's Response in Opposition to Agency Motion for Summary Judgment").

4

are licensed by, and in good standing with, the Alabama State Bar possess the authority to practice law in the courts of the State of Alabama, and to be admitted to practice before the Bar of the United States District Court for the Northern District of Alabama. *See*, *e.g.*, *Herndon v. Lee*, 199 So. 2d 74, 78 (Ala. 1967) ("Only such persons as are regularly licensed have authority to practice law."); N.D. Ala. Local Rule 83.1(a)(1).[17]

Before this court could formally address the issue of the standing of plaintiff's attorney to file pleadings in this action, however, his client, Alesya M. Paschal, filed a *pro se* pleading that objected to the "withdrawal" of her attorney — a pleading that this court construes as an objection to striking the most recent brief filed on her

---

[17] The pertinent portions of the Local Rule cited in text reads as follows:

    1. (a) Bar of Court.  The bar of this court consists of those persons previously admitted to (and not removed from) the bar of this court and of those persons who hereafter are admitted under this Rule.

        (1)  Any attorney who is admitted to practice before the Supreme Court of Alabama and who resides in Alabama or regularly engages in the practice of law in Alabama may be admitted to the bar of this court upon the submission of an application, payment of the prescribed fee, and

            (A)  the order of a judge of this court (on oral or written motion by a member of the bar of this court or on the court's own motion), and the administering of the prescribed oath before any judge (or other designee) of this court; . . . ;

N.D. Ala. LR 83.1(a)(1)(A).

behalf.[18]  Ms. Paschal asserts that: her attorney required *a $30,000 retainer* (!); she had "paid him in full"; and, accordingly, "[f]or him to *withdraw* [*sic*] denies me the benefit of what I paid him for."[19]

Hence, the dilemma.  This court is sensitive to plaintiff's concerns.  Even though the court is not pleased with the failure of her attorney to comply with the requirements of the "Uniform Initial Order," or the orders outlined above, this court is mindful of the interests of justice.  Therefore, in an effort to ensure that no aspect of plaintiff's *numerous* claims is overlooked, this court exercises its inherent discretion to consider not only the most recent responsive brief filed on plaintiff's behalf (doc. no. 69), but also the two briefs that were previously stricken (doc. nos. 53 and 60).  Accordingly, it is ORDERED that this court's prior orders striking plaintiff's initial and second briefs in response to defendant's motion for summary judgment are WITHDRAWN and RESCINDED,[20] both reply briefs are REINSTATED,[21] and each will be considered together with the brief filed on January

---

[18] *See* doc. no. 74 (Opposition to Attorney Howell Roger Riggs's Withdrawal as Attorney for Plaintiff).

[19] *Id.* (alterations and emphasis supplied).

[20] *See* doc. no. 56 (Order Striking Plaintiff's First Response to Summary Judgment); doc. no. 62 (Order Striking Plaintiff's Second Response to Summary Judgment).

[21] *See* doc. no. 53 (Plaintiff's First Response to Summary Judgment); doc. no. 60 (Plaintiff's Second Response to Summary Judgment).

9, 2015.[22]

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

[t]he mere existence of some factual dispute will not defeat

---

[22] *See* doc. no. 69.

summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

Following application of the foregoing standards to the pleadings, briefs, and evidentiary submissions, this court concludes that defendant's motion for summary judgment is due to be granted.

## III. SUMMARY OF FACTS

The following statements are the "facts" for summary judgment purposes only, and may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). All reasonable doubts have been resolved in favor of plaintiff, the nonmoving party. *See Information Systems and Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).[23]

---

[23] It should be noted that, on some occasions when plaintiff disputes the accuracy of defendant's statements of allegedly undisputed facts, plaintiff does not cite any evidence of record in support of her denial. *See, e.g.*, doc. no. 53 (Plaintiff's First Response to Summary Judgment),

## A.    Harassment

Plaintiff has worked as a GS-14 General Engineer in the "Future Warfare Center" of the United States Army's Space & Missile Defense Center on Redstone Arsenal since 2002.[24]

Steve Fox, Chief of the Models & Simulations Division in the Future Warfare Center, served as plaintiff's direct supervisor from 2002 until 2008.[25]  Prior to 2008, plaintiff and Fox had a "trusting, friendly" relationship.[26]  during 2005, for example, when plaintiff complained to Fox about inappropriate comments made to her by a male colleague, Fox forwarded plaintiff's complaints to the EEO Office, prepared a removal letter for the offender, and secured his resignation from federal service.[27]

¶ 36 (no citation provided).  Alternatively, on other occasions, plaintiff cites exhibits that are not part of the record as the basis for her denial of defendant's factual assertion.  *See, e.g.*, *id.* ¶ 12 (citing to "Ex. 175," which plaintiff did not attach), and ¶ 31 (citing to "Ex. 171," which plaintiff did not attach).  In those instances, the court will accept *defendant's* factual assertions as undisputed for purposes of summary judgment.  *See* doc. no. 7 (Uniform Initial Order), Appendix II (Summary Judgment Requirements), ¶ D.2.a, at 15 ("The non-moving party's response to the moving party's claimed undisputed facts shall be in *separately numbered paragraphs* that coincide with those of the moving party's claimed undisputed facts.  Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based.  *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*") (all emphasis in original).

[24] Ex. 1 (Plaintiff's Deposition), at 18-19.  The court cites to the exhibits in the same manner as the parties because the organization of the exhibits leaves much to be desired.  For example, the copy of plaintiff's deposition that defendant included in its evidentiary submission does not contain page numbers.  *See* doc. no. 41-1 (Plaintiff's Deposition).

[25] Ex. 1 (Plaintiff's Deposition), at 19.

[26] *See* Ex. 1, GX 41 (Notes Taken During Discussions With Plaintiff), at 7077.

[27] Ex. 150 (Plaintiff's Testimony), at 8719-21, 8764-66.

9

Despite such support of plaintiff by Fox, *she* frequently was insubordinate to *him*, and on numerous occasions engaged in such disrespectful conduct as "yelling [at Fox], slamming his office door, and stomping to and from his office."[28]

Their relationship was not improved by the fact that Fox occasionally made inappropriate comments to plaintiff. For example, when plaintiff asked in September of 2005 whether there was a position available for a female mechanical engineer, Fox asked, "What's her cup size?"[29] Later, in February of 2006, while plaintiff and Fox were on a business trip to Orlando, plaintiff wore the wrong bra. Fox suggested she take it off and wear "band-aids" instead.[30] Later that same year, he sent plaintiff an email saying that her "[b]ehavior problems" and "[h]ostility" indicated that it was time to "double [her] dose" of prescribed medication.[31] In September of 2006, while plaintiff was in Panama City, Fox asked her to "flash" him on a web camera.[32]

In October 2006, a female employee of the Space & Missile Defense Center posted nude photographs of herself on the internet.[33] Some employee of the Future Warfare Center brought copies of those photographs into the workplace on a compact

---

[28] Ex. 1, GX 45 (Collins Statement), at 6998 (alteration supplied); *see also* Ex. 1, GX 44 (Novak Statement), at 6994 (noting "yelling" by plaintiff at Fox).

[29] Ex. 202 (Emails).

[30] Ex. 150 (Plaintiff's Testimony), at 8725.

[31] Ex. 214 (Fox Emails) (alterations supplied).

[32] Ex. 150 (Plaintiff's Testimony), at 8726

[33] Ex. 1 (Plaintiff's Deposition), at 74-75.

disc.[34]   (Security filters installed on all Army computers prevented access to the internet website on which the photos had been posted.)  Fox talked to plaintiff about the photographs on several occasions, asking whether she had seen them.[35]  Colonel David Cox, Deputy to Larry Burger, Director of the Future Warfare Center, immediately initiated an investigation into the posting of the photographs because they created a potential security issue (*e.g.*, someone could use the photos to blackmail the female employee), and he instructed all Center employees to stop talking about them.[36]

The Army's Security Office, G-2, ultimately determined that the photographs did not create a security issue.[37]  Even so, Colonel Cox directed the female employee to remove them from the website in late 2006.[38]  In January of the following year, plaintiff was reprimanded for continuing to talk about the web photos.[39]  She did "not understand why [the female employee's] behavior is taboo at work if the Command" found no security issue,[40] and consequently met with Mary Peoples in the EEO Office

---

[34] Ex. 212 (Emails), at 4913.

[35] Ex. 150 (Plaintiff's Testimony), at 8726.

[36] Ex. 1 (Plaintiff's Deposition), at 76, 82; Ex. 150 (Plaintiff's Testimony), at 8777; Ex. 3 (Cox Statement), at 7152; Ex. 163 (Burger's Testimony), at 10190.

[37] Ex. 1, GX 25 (Fox Email), and GX 27 (Peoples Statement); Ex. 163 (Burger's Testimony), at 10258, 10142.

[38] Ex. 1 (Plaintiff's Deposition), at 77; Ex. 150 (Plaintiff's Testimony), at 8726.

[39] Ex. 150 (Plaintiff's Testimony), at 8726; Ex. 1, GX 27 (Peoples's Statement).

[40] Ex. 1, GX 25 (Fox Email) (alteration supplied).

to complain about being "singled out" for a reprimand.  She told Peoples that a male employee had not been reprimanded for similar behavior, and asked what actions had been taken against the female employee who had posted the photographs.[41]  Peoples subsequently made sure that the male employee was counseled, but told plaintiff that the female employee would not be disciplined, and that plaintiff should cease further discussion of the photographs.[42]

It should be noted that, at the time of the events described in the preceding paragraph, plaintiff did not complain to Mary Peoples about sexual harassment by a supervisor.[43]

At the end of a September 19, 2007 discussion, plaintiff told Steve Fox to "go to hell."[44]  The next day, Fox sought advice from Olusola Fadairo, the Space & Missile Defense Center's Human Resources Specialist, who recommended that he initiate a "Letter of Concern":  an action that would offer counseling to plaintiff, but one that would not constitute a "formal action," nor an event that would be included in her personnel file.[45]

---

[41] Ex. 150 (Plaintiff's Testimony), at 8730, 8831, 8865; Ex. 1, GX 27 (Peoples's Statement).

[42] Ex. 1, GX 27 (Peoples's Statement).

[43] *See id.*; Ex. 162 (Plaintiff's Testimony), at 9734-35.

[44] Ex. 150 (Plaintiff's Testimony), at 8902.

[45] Ex. 32 (Fadairo Email); Ex. 152 (Fox's Testimony), at 8987, 9008-11, 9039; Ex. 160 (Williams's Testimony), at 9360-62, 9373-74.

On October 31, 2007, while Fox's Letter of Concern was under review by the Human Resources Department, plaintiff made statements to Fox that led him to believe that she was accusing him of "discrimination based on sex and handicap."[46] According to Fox, plaintiff

> mentioned that [she] had a brain injury that was documented in a workman's compensation case and confirmed by a doctor. [She] stated that [he] needed to request the information from the Office of Workers' Compensation Programs.  When [he] pursued the issue [she] quickly changed it to an issue of [his] inability to understand [her] because [she is] a "female with a high-pitched voice."

Ex. 33 (Fox Email) (alterations supplied).  Fox consulted Johnetta Graves in the Space & Missile Defense Center's Legal Department.[47]

On November 26, 2007, Fox scheduled a meeting with plaintiff, to discuss her conduct, and advised her that she could request a Union representative to be present.[48] Three days later, he handed her a "Letter of Concern," detailing plaintiff's recurring insubordinate conduct and performance issues.[49]  The Letter did not implement any disciplinary action, decrease in pay, demotion, or corrective action;[50] but, based upon plaintiff's statements about a 1996 head injury, and in accordance with instructions

---

[46] Ex. 33 (Fox Email).

[47] *Id.*

[48] Ex. 1, GX 58 (Plaintiff Emails), at 7043.

[49] Ex. 1 (Plaintiff's Deposition), at 69; Ex. 1, GX 24 (Letter of Concern).

[50] *See* Ex. 1, GX 24 (Letter of Concern).

that had been given to Fox by the EEO Office, his Letter suggested that plaintiff "seek an evaluation from the Employee Assistance Program on Redstone Arsenal." Even so, Fox specifically noted that he did "not have the authority to *direct* that [plaintiff] seek an evaluation[,] or that [she] discuss the contents of [the letter] with anyone."[51]  Most importantly, despite Fox's reference to plaintiff's head injury, his Letter did not label plaintiff as "disabled."[52]  Nevertheless, the Letter *did* request that she provide documentation, *if* she had a medical condition.  Plaintiff did not respond to that request.  She never submitted any medical documentation suggesting that she had an impairment.[53]  In fact, plaintiff admits that there is no duty in her job description that is limited by her head injury.[54]

Plaintiff met with Ruby Turner and Richard Lewis in the office of the Employee Assistance Program on January 10, 2008, to voice her concerns about Fox's Letter of Concern and her perception that it amounted to an act of retaliation.[55] She returned to Ms. Turner's office on January 14, 2008.  According to Ms. Turner, there was "no specific indication of sexual harassment" during either meeting.[56]  Mr.

---

[51] *Id.* (emphasis and alterations supplied); Ex. 152 (Fox's Testimony), at 9032.

[52] *See* Ex. 1, GX 24 (Letter of Concern).

[53] *See* Ex. 1 (Plaintiff's Deposition), at 72-73.

[54] Ex. 150 (Plaintiff's Testimony), at 8716-17.

[55] *Id.* at 8736.

[56] Ex. 1, GX 46 (Turner Statement).

Lewis likewise stated that plaintiff's focus during the meeting he attended on January 10 was on retaliation, and he denied that he told plaintiff that she had been sexually harassed.[57]  Plaintiff then met with Fox, who told her that she could talk to Cindy Van Rassan, a lawyer, or she could talk to her Union representative, and he gave her a list of other people she could consult for advice.[58]

Plaintiff complained to the President of the employee Union,[59] and he took her complaint to Larry Burger, Director of the Future Warfare Center, on January 25, 2008.[60]  Mr. Burger said he would initiate an investigation by an outside agency.[61] In the meantime, he counseled Steve Fox, and directed him to treat plaintiff in the same manner that he dealt with all other employees.[62]

The following month, Colonel William Whitney, from outside the Future Warfare Center, began an investigation.  With "guidance from the Command Legal and EEO offices," he conducted interviews of several individuals.[63]  Meanwhile, on February 27, 2008, plaintiff submitted an informal complaint of sexual harassment,

---

[57] Ex. 2 (Lewis's Declaration), at 7579.

[58] Ex. 150 (Plaintiff's Testimony), at 8737-38.

[59] *See* Ex. 162 (Plaintiff's Testimony), at 9737-38.

[60] Ex. 151 (Burger's Testimony), at 8922.

[61] Ex. 42 (Eierman's Declaration), at 7584.

[62] Ex. 22 (Burger's Statement), at 7156; Ex. 151 (Burger's Testimony), at 8936.

[63] Ex. 42 (Eierman's Declaration), at 7584; Ex. 1, GX 40 (Col. Whitney Investigation Report), at 6919.

a hostile working environment, and disability discrimination to the EEO Office.[64]
The following day, February 29, 2008, Colonel Whitney submitted the results of his
investigation to the EEO Office and the Legal Department.  He found that there had
been mutually inappropriate exchanges between plaintiff and Steve Fox, but observed
that plaintiff had engaged in "openly defiant and insubordinate" conduct toward Fox,
and concluded by stating that present and former co-workers "deny a sexually hostile
work environment."[65]

        Dr. Steven Pierce, plaintiff's second-line supervisor and Director of the
Simulations and Analysis Directorate of the Future Warfare Center, removed Steve
Fox as Chief of the Models & Simulations Division sometime around March 3, 2008,
and reassigned him to a different Directorate.[66]   On March 6, 2008, Dr. Pierce
informed plaintiff of Fox's reassignment, and told her that she should thereafter
report to him (Dr. Pierce), as her direct supervisor, beginning on March 10, 2008.[67]

        The EEO Office noted no resolution of plaintiff's informal complaint on April
11, 2008, and issued her a "Notice of Right to File a Discrimination Complaint" and

---

[64] Ex. 1, GX 37 (EEO Counselor's Report).

[65] Ex. 1, GX 40 (Col. Whitney Investigation Report), at 6921.

[66] Ex. 153 (Dr. Pierce's Testimony), at 9076.

[67] Ex. 150 (Plaintiff's Testimony), at 8740-41.

a "Notice of Rights and Responsibilities."[68]  Plaintiff filed a formal EEO Complaint on April 28, 2008, alleging sexual harassment, disability discrimination, and retaliation.

The Army initiated a formal AR 15-6 Investigation of plaintiff's sexual harassment allegations.  That investigation was conducted by Randy Gallien, an individual outside the Future Warfare Center.[69]  Plaintiff's Union representative accompanied her to all meetings during the investigation.[70]  Gallien interviewed and procured sworn statements from plaintiff, Steve Fox, Dr. Steven Pierce, and several employees in the Future Warfare Center, including Justin Novak, Veronica Collins, Ruby Turner, Martin Goodman, Kevin Crumlish, Mike Davis, and Jason Baker.[71]  None of those co-workers substantiated plaintiff's claim of sexual harassment by Fox, or her allegations that Larry Burger propagated a philosophy of management that used subordinates to "target" employees.[72]  In fact, several employees asserted that

---

[68] Ex. 1, GX 37 (EEO Counselor's Report); Ex. 1, GX 38 (Notice of Right to File a Discrimination Complaint); Ex. 1, GX 39 (Notice of Rights and Responsibilities).

[69] Ex. 1 (Plaintiff's Deposition), at 101.

[70] *Id.*; Ex. 1, GX 43 (Chronology of Investigation).

[71] Ex. 1, GX 43 (Chronology of Investigation); Ex. 1, GX 44 (Novak Statement); Ex. 1, GX 45 (Collins Statement); Ex. 1, GX 46 (Turner Statement); Ex. 1, GX 47 (Goodman Statement); Ex. 1, GX 48 (Crumlish Statement); Ex. 1, GX 49 (Davis Statement); Ex. 1, GX 50 (Baker Statement).

[72] *See* Ex. 1, GX 44 (Novak Statement); Ex. 1, GX 45 (Collins Statement); Ex. 1, GX 46 (Turner Statement); Ex. 1, GX 47 (Goodman Statement); Ex. 1, GX 48 (Crumlish Statement); Ex. 1, GX 49 (Davis Statement); Ex. 1, GX 50 (Baker Statement).

plaintiff had, *herself*, engaged in calculating, insincere, or manipulative conduct.[73] Gallien's report confirmed that accusation:  he recorded that "[a] pattern of verbal abuse and manipulation of facts [*by plaintiff*] to cause targeted employees to leave is substantiated by every member of the organization interviewed."[74]  He concluded that, even though "improper behavior between a supervisor [Steve Fox] and subordinate [plaintiff] did occur, the behavior did not rise to the level of sexual harassment."[75]  Lieutenant General Kevin Campbell, then Commanding General of the Space and Missile Defense Center, approved Gallien's findings on August 8, 2008, but determined that plaintiff need not comply with the directive contained in Fox's Letter of Concern.  Instead, he directed that *all* Future Warfare Center employees undergo interpersonal relationship counseling and sexual harassment training.[76]

## B.    Events Leading Up to Plaintiff's Disciplinary Actions

During the years between 2005 and 2008, plaintiff demonstrated "a history of belligerent, insubordinate, defiant and harassing behavior against government co-

---

[73] *See* Ex. 1, GX 44 (Novak Statement); Ex. 1, GX 45 (Collins Statement); Ex. 1, GX 47 (Goodman Statement); Ex. 1, GX 48 (Crumlish Statement); Ex. 1, GX 49 (Davis Statement); Ex. 1, GX 50 (Baker Statement).

[74] Ex. 1, GX 51 (Gallien Findings), at 6990 (alterations supplied).

[75] *Id.* at 6983 (alterations supplied).

[76] Ex. 44 (Campbell Memorandum).

workers, government contractors, and her supervisor," to the point that some "contractors [had] asked <u>not</u> to be invited to [the Future Warfare Center] staff meetings based on her defiance/insubordination/hostility in [those] meetings."[77]  For example, when a co-employee corrected plaintiff during a conference call, she "became so angry she threw a pen in [his] direction."[78]  On another occasion, an employee reported that plaintiff "was hysterically yelling at [his] supervisor outside of [his] cubicle that he was too 'stupid' to understand what she was trying to explain and that she was not able to 'dummy' her work down to his level."[79]  As previously noted, plaintiff told Steve Fox to "go to hell" at the end of a September 19, 2007 discussion.[80]  Eventually, plaintiff's behavior became so disturbing that several of her co-workers met with officials in the Human Resources Department to describe their

---

[77] Ex. 1, GX 11 (Jason Baker Email), at 375 (alterations supplied). *See also* Ex. 157 (Elliot's Testimony), at 9282 (plaintiff's "aggressiveness and combativeness turned a lot of people off"); Ex. 1, GX 49 (Davis Statement) (noting plaintiff's "screaming and yelling"); Ex. 1, GX 45 (Collins Statement), at 6998 (plaintiff showed "insubordination in demeanor and verbal remarks" that caused contractors to ask to be excused from weekly calls).  These citations are another example of the parties' poor exhibit organization.  The numerous exhibits filed by the parties are not separated into separate documents.  Further complicating matters, labels, such as "GX 11," are placed only at the beginning of the exhibit, and it is difficult to find each individual exhibit among the 59 attached to plaintiff's deposition.  Defendant provided a courtesy copy with each individual exhibit tabbed out, but the courtesy copy does not contain an ECF heading identifying the ECF document and page number associated with the documents.  Accordingly, the court will continue to cite to the exhibits in the same manner as the parties.

[78] Ex. 1, GX 44 (Novak Statement), at 6994 (alterations supplied).

[79] Ex. 1, GX 50 (Baker Statement), at 7018 (alterations supplied).

[80] Ex. 150 (Plaintiff's Testimony), at 8902.

problems in attempting to work with her.[81]

In late 2007, plaintiff and Dr. Steven Pierce competed for the position of Director of the Simulations and Analysis Directorate of the Future Warfare Center.[82] Prior to that time, plaintiff described her relationship with Dr. Pierce as "a friendly relationship."[83]  Indeed, during the period that she and he competed for the same position, Dr. Pierce told plaintiff that he would "have no problems working with [her]," if she were to be awarded the position.[84]  The relationship soured on February 11, 2008, however, when Dr. Pierce was selected, and he became plaintiff's second-line supervisor.[85]

Prior to Dr. Pierce's selection, plaintiff learned that she was to be assigned as a member of a selection committee established by Major Jason Conroy in the G-3 Strategy Policy & Integration Division.[86]  During April of 2008, after Dr. Pierce's selection, plaintiff also was notified that her application to attend a training course had been granted.[87]  Plaintiff could not simultaneously attend both.  She informed

---

[81] Ex. 1, GX 51 (Gallien Findings), at 6982.

[82] Ex. 97 (Selection Memorandum).

[83] Ex. 150 (Plaintiff's Testimony), at 8813.

[84] *Id.* (alteration supplied).

[85] Ex. 153 (Dr. Pierce's Testimony), at 9070.

[86] *Id.* at 9079-80, 9085.

[87] *Id.* at 9079-81.

Major Conroy and Dr. Pierce of the conflict, and Dr. Pierce told her that the selection committee was a "priority," and that she would be scheduled to attend the next training course.[88]   Plaintiff replied that postponing the training course "wasn't an option."[89]   When Dr. Pierce reiterated that the selection committee was a priority, she said "that it was not her priority."[90]   Plaintiff eventually backed down from her insubordinate position, and received her desired training less than one year later.[91]

Dr. Pierce counseled plaintiff on her behavior in July of 2008:

> I told her that she needed to listen, and to consider constructive advice and feedback.  I told her to be polite when dealing with fellow employees, as well as supervisors.  One of the other things I told her is to look at the person you are talking to and answer questions when asked by fellow workers, or your leadership because, oftentimes, she doesn't look at you when you are asking her questions.
>
> I told her to think before responding, identify and emphasize key points, stay on message, don't veer off because she had a tendency to veer off the message when asked questions.  My overall assessment focused on identifying issues, be a team player, be considerate of others and stay on the message.

Ex. 127 (Dr. Pierce's Testimony), at 567-68.

During a telephone conversation in late September of 2008, plaintiff referred

---

[88] *Id.* at 9079, 9083.

[89] *Id.* at 9086.

[90] *Id.* at 9086.

[91] Ex. 162 (Plaintiff's Testimony), at 9801.

to the Commanding General, Lieutenant General Kevin Campbell, as a "shithead."[92] On October 1, 2008, Dr. Steven Pierce met with plaintiff, her Union representative, and Dr. John Tomkovich, Chief of the Operations Division, for a counseling session regarding that behavior.[93]   During that meeting, plaintiff made "sarcastic," "condescending," "dismissive and/or disrespectful remark[s]," and "clearly insinuated that [Dr. Pierce] was lying."[94]   During a meeting held later that same month, on October 28, 2008, plaintiff manifested "utter disdain (almost bordering on insubordination)" for Dr. Pierce.[95]

In late 2008, plaintiff and Jim Watkins, an employee in the Future Warfare Center, competed for the position of Chief of the Models & Simulations Division, which had become vacant when Dr. Pierce removed Steve Fox from the position and transferred him to another Directorate.[96]   Watkins was eventually selected in early 2009, and he became plaintiff's direct supervisor.  Shortly after his selection, he appointed plaintiff the "Acting Division Chief" during his temporary absence

---

[92] Ex. 1, GX 6 (September Morash Memorandum).  Plaintiff claims that this memorandum, as well as several others, showed that her supervisors used employees to conduct surveillance of her activities.  *See* doc. no. 53 (First Brief in Opposition to Summary Judgment), at 58.  However, there is no evidence in the record that plaintiff's supervisors directed anybody to conduct surveillance.

[93] Ex. 127 (Dr. Pierce's Testimony), at 568.

[94] Ex. 1, GX 19 (Dr. Tomkovich Memorandum) (alterations supplied).

[95] Ex. 1, GX 7 (October Morash Memorandum).

[96] Ex. 1 (Plaintiff's Deposition), at 48-49.  See also the textual discussion accompanying notes 66 and 67 in Part IV.A., *supra*.

22

between March 31 and April 3, 2009.[97]  Plaintiff did not perform her delegated duties,

however, and Watkins met with her for purposes of a counseling session on April 16,

2009.  She was "belligerent and argumentative throughout."[98]

During a May 5, 2009 Models & Simulations Division Staff Meeting, plaintiff

became "disruptive" by attempting to interject various issues unrelated to the meeting

in a "hostile, abrasive, insolent, and insubordinate" manner.[99]  Watkins again met with

plaintiff for a counseling session on May 20, 2009, to ensure that she understood

what was expected of her during staff meetings.[100]  Two witnesses were present on

that occasion: plaintiff's Union representative, and Paul Page, Chief of the Studies

and Analysis Division of the Future Warfare Center.[101]  Even though plaintiff

repeatedly interrupted Watkins, "continually challenged every statement Mr. Watkins

made," appeared frustrated and angry about being counseled, and generally did not

speak in a manner that "an employee should speak to a supervisor," Watkins never

raised his voice and "was cordial during the entirety of the session."[102]

Dr. John Tomkovich served as note-taker for a July 17, 2009 counseling

---

[97] Ex. 1, GX 30 (Watkins Memorandum), at 135.

[98] *Id.* at 135-36.

[99] Ex. 1, GX 8 (Morash Memorandum); Ex. 1, GX 30 (Watkins Memorandum), at 137.

[100] *Id.*

[101] Ex. 1, GX 16 (Page Memorandum).

[102] *Id.*; *see also* Ex. 1, GX 30 (Watkins Memorandum), at 137.

session between Watkins and plaintiff, and recorded that she "regularly did not allow Mr. Watkins to finish sentences, [] was dismissive to just about anything he said, and [that] she acted as if she was put out that she had to report to Mr. Watkins."[103]

Three days later, while plaintiff was engaged with her attorney in a telephone discussion about her EEO activity, she made statements in a voice loud enough to be overheard by other employees. Among other things, she threatened "to have Mr. Jim Watkin['s]s and Mr. Jason Baker's security clearances revoked and have them both fired for lying under oath."[104]

Since 2005, no other Future Warfare Center employee has engaged in similar disrespectful conduct towards a supervisor.[105]  Plaintiff was required to submit to counseling for numerous such episodes of misconduct.[106]  Due to the nature of her conduct, and the allegations that she had made during meetings, supervisors began a practice of ensuring that witnesses were present during any meeting with plaintiff.[107]

## C.   Two-Day Suspension

---

[103] Ex. 1, GX 20 (Dr. Tomkovich Memorandum) (alterations supplied).

[104] Ex. 1, GX 9 (Morash Memorandum) (alteration supplied).

[105] Ex. 127 (Dr. Pierce's Testimony), at 574; Ex. 139 (Dr. Pierce Dr. Pierce's Testimony), at 3108; Ex. 134 (Crumlish's Testimony), at 1857.

[106] Ex. 127 (Dr. Pierce's Testimony), at 566-70; Ex. 1, GX 30 (Watkins Memorandum), at 143-56; Ex. 139 (Dr. Pierce's Testimony), at 3098-3101.

[107] Ex. 60 (Dr. Pierce Email), at 4874; Ex. 56 (Owens's Declaration), at 5666; Ex. 38 (Dr. Tomkovich's Declaration), at 5639; Ex. 61 (Dr. Pierce's Declaration), at 5690; Ex. 144 (Owens's Testimony), at 6197-98.

Plaintiff confronted Jim Watkins, her direct supervisor, on July 21, 2009.

Sharon Lockhart, a co-worker, described the incident that then occurred as follows:

> I was in my cubicle, when at approximately 0630, I heard Aleysa
> Paschal knock on Jim Watkin[s]'s door and ask where her copy of
> something was. Jim said Andrea [Callahan, his secretary, had] it locked
> up with your personnel file. Aleysa said she wanted a copy. It sounded
> like they walked toward Andrea's desk, and Jim said she could get a
> copy when Andrea came in; he didn't know where she kept the key.
> Aleysa said she wanted a copy again. Jim said Anne [Malcolm] will
> probably get here before Andrea and will give her a copy. Aleysa said
> was it left on my desk? Is it in my mailbox? She sounded almost frantic.
> Jim said it wouldn't be left like that, it was locked up. Aleysa said she
> wanted a copy now, and that Jim had a copy in his records, give her a
> copy of that. It sounded like they went back into Jim's office, and
> momentarily Aleysa came out, walking heavily and fast, and sounded
> like she headed to the business center. When she returned she asked Jim
> something, and I heard him say there are supporting documents. She
> asked why the supporting documentation was not with "it", [and] he
> replied something. I then heard him say he could put the supporting
> documents with it. She said yes, "it's going to be with it." Marched off
> again heavily and fast, but started saying things back in a loud voice. I
> remember, "Expect to talk to a lawyer." Jim said, "yeah, yeah, yeah."
> Aleysa made a comment. She was back in a few minutes, and it sounded
> as if she was in Andrea's cubicle, turning on the computer, and
> scanning. All the time she was yelling things at Jim (he was in his
> office). I don't remember the exact order things were said but it was
> things like saying he would never make it a year as a supervisor.
> Someone had guaranteed her that (Army Chief of Staff or Secretary of
> the Army, I believe — I know it was someone out of this command at
> that level). She said that a general was looking at Jim's use of the
> computer to download pornography. I don't remember the general's
> name (think it was something like Kern), but she said something on the
> line's [*sic*] of not General Campbell who will cover it up or smooth it
> over, something like that. She called Jim a name . . . something on the
> lines of a despicable human being, she was ashamed of him as a human

being, much less a government employee.  She assured him that somebody was looking into him bringing the laptop home to download pornography, then making copies at work.  When he said he was tired of those accusations, she said he knew it was true, he knew that she had seen him do it.  Something derogatory about him lying about it, not doing any good, it would come out.  These type of comments kept going.  Jim said something a couple of times about tired of the accusations, raising his voice some, not to the extent that Aleysa was, but to the point that my thoughts were "she's taunting him, trying to make him mad, if she keeps going, it's probably going to happen.  What do I need to do if this gets physical?  Who do I need to call?"  After approximately 15 minutes, Jim shut his door, and Aleysa yelled something like, "what are you doing behind those doors that you don't want anyone to see."  Nothing was said by either of them after that.  Aleysa stayed on Andrea's computer a little bit longer, leaving after my phone rang.

Ex. 1, GX 5 (Lockhart Memorandum) (alterations supplied).  Plaintiff's behavior was so aggressive that Sharon Lockhart considered calling security, and she remained "scared for the rest of the day, literally shaking."[108]

The following day, plaintiff became so angry during a close-out counseling session conducted by Dr. Steven Pierce, her second-line supervisor, that she left his office to call her Union representative, and told Dr. Pierce that "this will be told to the Judge on Friday when you're being investigated for reprisal."[109]

Following those incidents, Watkins consulted the Space & Missile Defense Center's Legal and Human Resources Departments and Dr. Pierce, all of whom

---

[108] Ex. 128 (Lockhart's Testimony), at 736-37.

[109] Ex. 1, GX 30 (Watkins Memorandum), at 156.

26

advised Watkins to contact the office of "Management Employee Relations" for direction on how to proceed.[110]   He then worked with that office to prepare a disciplinary request.[111]

Watkins submitted a "Request for Disciplinary Action" to Melinda Williams, Management Employee Relations Specialist, on September 3, 2009, and asked that he be authorized to impose a two-day suspension on plaintiff for disrespectful behavior toward her supervisor.  That Request was supported by several materials, including:  memoranda from Sharon Lockhart and Paul Page; Watkins's own recounting of the July 21, 2009 incident; and a weighing of the so-called "*Douglas* factors*,*" which are based upon the opinion in *Douglas v. Veterans Administration*, 5 M.S.P.B. 313 (1981), in which the Merit Systems Protection Board articulated twelve factors that may be considered when determining the appropriate sanction for a particular offense. [112]

Melinda Williams reviewed the materials submitted by Watkins, and prepared a "Notice of Proposed Two Day Suspension" letter.[113]  Watkins delivered the Notice to plaintiff on October 8, 2009.[114]  She was allowed a period of time to respond.

[110] Ex. 126 (Watkins's Testimony), at 488-95, 500.

[111] *Id.* at 514-15; Ex. 132 (Williams's Testimony), at 1027.

[112] Ex. 1, GX 30 (Recommendation Materials), at 117-18.

[113] Ex. 132 (Williams's Testimony), at 1030-31, 1053.

[114] Ex. 1, GX 28 (Notice of Proposed Two-Day Suspension).

Watkins submitted the recommendation materials to Dr. Steven Pierce, plaintiff's second-line supervisor and the sustaining official, on December 11, 2009.[115] Dr. Pierce submitted his proposed decision to sustain the suspension to the Human Resources Department, noting his consideration of Watkins's Notice and plaintiff's reply.[116] Melinda Williams, Management Employee Relations Specialist, verified that the proposed two-day suspension complied with the applicable table of penalties, that it contained an analysis of the *Douglas* factors, and that plaintiff had been provided an opportunity to respond.[117]

Dr. Pierce issued plaintiff his "Notice of Decision" on February 1, 2010, approving the two-day suspension, and relying on Watkins's Notice, the supporting recommendation materials, plaintiff's reply, and the *Douglas* factors.[118]

Plaintiff filed an EEO Complaint for the suspension, but an Administrative Law Judge found in favor of the Army.[119]

**D.    Five-Day Suspension**

Despite her two-day suspension, plaintiff remained openly hostile to her

---

[115] Ex. 1 (Plaintiff's Deposition), at 84; Ex. 1, GX 30 (Recommendation Materials).

[116] Ex. 1, GX 30 (Recommendation Materials), at 101.

[117] Ex. 132 (Williams's Testimony), at 1030-31, 1037-39.

[118] Ex. 1, GX 29 (Notice of Decision).

[119] Ex. 63 (EEO Decision).

supervisors.[120]  She berated Colonel William Whitney, her third-line supervisor and Deputy to Larry Burger, Director of the Future Warfare Department, during a November 3, 2010 meeting in which Cathy Bain, Mr. Burger's executive assistant, sat in as a witness.  Eventually, plaintiff stormed out while yelling at Colonel Whitney "in a loud, condescending, and disrespectful voice," and shaking a pen at him.[121]  Colonel Whitney asked her if she was threatening him, and she responded, "Threaten you. . . . Threaten you?  You're twice as big as I am!"[122]  Then, "[i]n a loud and belligerent tone, while pointing and shaking her pen at [Colonel Whitney], [plaintiff] said, 'I'm reporting this meeting as hostile.  This is a hostile environment!'"[123]  Despite such behavior, Colonel Whitney reportedly "kept his composure" throughout the meeting.[124]

On December 22, 2010, Kevin Crumlish, who had become Chief of the Models & Simulations Division and plaintiff's direct supervisor during the previous month, submitted a "Request for Five-Day Suspension" of plaintiff to the EEO Office, the

_____

[120] Ex. 134 (Crumlish's Testimony), at 1855-57; Ex. 136 (Bain's Testimony), at 1903-09.

[121] Ex. 1, GX 10 (Bain Memorandum); *see also* Ex. 1, GX 33 (Whitney Memorandum), at 1339; Ex. 136 (Bain's Testimony), at 1898-99, 1904.

[122] Ex. 1, GX 10 (Bain Memorandum); *see also* Ex. 1, GX 33 (Whitney Memorandum), at 1339.

[123] Ex. 1, GX 10 (Bain Memorandum).

[124] Ex. 136 (Bain's Testimony), 1916 (alterations supplied); Ex. 1, GX 10 (Bain Memorandum).

Civilian Personnel Advisory Center, and Dr. Steven Pierce, plaintiff's second-line supervisor.  In proposing the suspension, Crumlish spoke with Cathy Bain (Larry Burger's executive assistant), and Colonel William Whitney (plaintiff's third-line supervisor and Deputy to Larry Burger, Director of the Future Warfare Department).[125]  Plaintiff received a copy of Crumlish's "Notice of Proposed Five-Day Suspension" in January of 2011.[126]  Kimberly Fitzpatrick, a Management Employee Relations representative, verified that the suspension range was appropriate under the applicable table of penalties, and that it complied with all regulatory guidelines.[127]  Dr. Pierce issued a "Notice of Decision" implementing the five-day suspension to plaintiff on March 29, 2011, specifically relying on the materials attached to the Request for Five-Day Suspension and the analysis of the *Douglas* factors.[128]

Plaintiff filed an EEO Complaint over the suspension, but an Administrative Law Judge found in favor of the Army.[129]

**E.**    **Twelve-Day Suspension**

---

[125] Ex. 134 (Crumlish's Testimony), at 1850; Ex. 135 (Fitzpatrick's Testimony), at 1879.

[126] Ex. 1, GX 31 (Notice of Proposed Five-Day Suspension).

[127] Ex. 135 (Fitzpatrick's Testimony), at 1883-84.

[128] Ex. 1, GX 32 (Notice of Decision), ¶¶ 2, 4; Ex. 64 (Dr. Pierce's Declaration), at 1672; Ex. 1, GX 33 (Request for Five-Day Suspension).

[129] Ex. 65 (EEO Decision).

Plaintiff was asked to come to the office of Dr. Steven Pierce, her second-line supervisor, on November 8, 2011, to discuss standards for the 2011-2012 fiscal year. During that meeting, however, she continuously focused on the prior year's objectives.[130]  Plaintiff grew belligerent when Dr. Pierce asked her to focus on the purpose of the meeting.[131]  She stood up and declared that, if Dr. Pierce was going to be "hostile," she wanted her EEO representative to be present — a demand to which Dr. Pierce consented.[132]  The following day, the Legal Department contacted Dr. Pierce regarding plaintiff's allegation that he had been "hostile" during their meeting, and yelled "Stop, Stop, Stop."[133]  Dr. Pierce denied that he did so, and two witnesses, Anne Malcolm and Deputy Director Robert Hill, confirmed that they had not heard either yelling or such statements.[134]  Plaintiff forwarded her allegations to defendant, John McHugh, Lieutenant General Richard Formica (who was then Commanding General of the Space & Missile Defense Center), General Dunwoody, General Odierno, and Major General William McCoy.[135]

Kevin Crumlish consulted a Management Employee Relations representative

---

[130] Ex. 1, GX 36 (Malcolm Memorandum), at 2367-70.

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] *Id.*; Ex. 1, GX 34 (Notice of Proposed Fourteen-Day Suspension), at 2313.

[135] Ex. 1, GX 34 (Notice of Proposed Fourteen-Day Suspension), at 2313.

for assistance in drafting a "Request for Fourteen-Day Suspension" for plaintiff's disrespectful conduct towards a supervisor and lack of candor.[136]  Crumlish submitted the Request to the EEO Office and Dr. Pierce on January 5, 2012.  Larry Burger, Director of the Future Warfare Center, decided to reduce the suspension to twelve-days.[137]   Plaintiff received his "Notice of Decision to Impose a Twelve-Day Suspension" on April 2, 2012.[138]

She filed an EEO Formal Complaint over the suspension, but an Administrative Law Judge found in favor of the Army.[139]

## F.   Security Clearance Concerns

Supervisors must report disciplinary actions to G-2, the Army's Security Office, together with a recommendation as to whether the offender's security clearance should be suspended.[140]   Security clearances for each employee on Redstone Arsenal are routinely reviewed every five years.  Plaintiff's five-year review had occurred independently of any disciplinary action in 2009.[141]

Reports to G-2 were made following plaintiff's 2010 and 2011 two-day and

---

[136] Ex. 1, GX 34 (Notice of Proposed Fourteen-Day Suspension); Ex. 138 (Crumlish's Testimony), at 2976-83.

[137] Ex. 1, GX 35 (Notice of Decision), ¶ 4.

[138] *Id.* ¶¶ 2, 4.

[139] Ex. 67 (EEO Decision).

[140] Ex. 139 (Dr. Pierce's Testimony), at 3134-35; Ex. 138 (Crumlish's Testimony), at 3003

[141] Ex. 162 (Plaintiff's Testimony), at 9481; Ex. 68 (Moore Email).

five-day suspensions, but on both occasions Dr. Pierce stated that he did not deem it necessary to suspend her security clearance.[142]   G-2 independently suspended her security clearance after being notified of her twelve-day suspension in 2012, and initiated another security clearance review.[143]   Plaintiff filed an EEO Formal Complaint over that security clearance investigation, but an Administrative Law Judge found in favor of the Army.[144]

## G.   Performance Evaluations and Awards

Performance evaluations are conducted annually.  Individuals receive a block-rating on a scale of 1 to 5.[145]  A "1-block" is the highest rating ("Excellent"), and a "2-block" is a "Successful" rating.[146]   Typically, nobody sees an individual's evaluation other than supervisors and the affected employee.  Moreover, evaluations are not included in promotion applications.[147]  Even so, annual cash awards are based upon performance evaluations.  For each such award, a Future Warfare Center Award Board is created and comprised of six directors and a member of Personnel, to ensure

---

[142] Ex. 69 (Dr. Pierce Memorandum), at 2621; Ex. 138 (Crumlish's Testimony), at 3000; Ex. 139 (Dr. Pierce's Testimony), at 3133.

[143] Ex. 139 (Dr. Pierce's Testimony), at 3133-37.

[144] Ex. 67 (EEO Decision).

[145] Ex. 137 (Plaintiff's Testimony), at 2746.

[146] *Id.* at 2747.

[147] Ex. 154 (Dr. Pierce's Testimony), at 9127.

33

equity, consistency, and appropriate levels of awards for performance.[148]  Typically,

the Board accepts the recommendations of supervisors, who are most familiar with

an employee's work, but they may adjust the award to ensure consistency.[149]  The

Board's provision of performance awards is governed by Army Regulatory 672-20,

pertaining to Incentive Awards.[150]  Performance awards in the Future Warfare Center

are capped at a maximum amount of $2,500.[151]  The largest award plaintiff has

received was $2,000.[152]

### 1.    2007-2008 Evaluation and Award

Plaintiff's annual evaluation in July of 2008 resulted in a 1-block rating and a

performance award of $1,700.[153]  Her award was based "entirely on [her] type of work

performed, difficulty of the tasks, and contributions to the organization and the

warfighter."[154]  Plaintiff's award was consistent with other co-workers at the GS-14

pay-grade who worked under the supervision of Dr. Pierce, and who received awards

---

[148] Ex. 70 (Burger's Declaration), at 5707; Ex. 71 (Dr. Pierce's Declaration), at 3927.

[149] *Id.*

[150] *Id.* at 5709.

[151] *Id.* at 5708; Ex. 72 (Watkins's Declaration), at 5661.

[152] Ex. 73 (Plaintiff's Performance Awards).

[153] Ex. 74 (Burger's Declaration), at 8453-55; Ex. 1, GX 30 (Final Counseling), at 143-44; Ex. 75 (2007-2008 Evaluation), at 3643.

[154] Ex. 76 (Dr. Pierce's Declaration), at 8464 (alteration supplied); Ex. 77 (Colonel Whitney's Declaration), at 8468; Ex. 1, GX 30 (Final Counseling), at 143.

of $1,700, $1,800, or $2,500.[155]

### 2.   2008-2009 Evaluation and Award

Plaintiff's July 2009 annual evaluation described her as "caustic" and "dismissive,"[156] but she still received a 2-block rating and a performance award of $1,000.[157]   Her rating reflected that her performance and contributions met expectations, but did not exceed them, particularly with respect to her disclosure of information, conduct during staff calls, and certain presentations.[158] Her performance award "was in line with other employees who perform[ed] at that level of performance (*i.e.*, Successful)."[159]

Plaintiff filed an EEO Complaint over that evaluation and award, but an Administrative Law Judge found in favor of the Army.[160]

### 3.   2009-2010 Evaluation and Award

Plaintiff received a 2-block("Successful") rating and a performance award of

---

[155] Ex. 74 (Burger's Declaration), at 8455; Ex. 77 (Whitney's Declaration), at 8468.

[156] Ex. 1, GX 20 (Dr. Tomkovich Memorandum).  The evaluation session was attended by plaintiff, Jim Watkins (plaintiff's direct supervisor at the time), Frank Bowles (her Union representative), and Dr. John Tomkovich (who served as note-taker).

[157] Ex. 79 (2008-2009 Evaluation), at 3631.

[158] Ex. 72 (Watkins's Declaration), at 5663; Ex. 61 (Dr. Pierce's Declaration), at 5691; Ex. 1, GX 30 (Watkins Memorandum), at 135-37, 145-47; Ex. 142 (Watkins's Testimony), at 6109-24.

[159] Ex. 70 (Burger's Declaration), at 5708 (alteration supplied).

[160] Ex. 45 (EEO Decision), at 3869.

$1,000 in July of 2010.[161]   Her rating was not higher because:  she had failed to complete a Space Model & Simulation "Roadmap" requested by Dr. Steven Pierce, her second-line supervisor; she failed to meet expectations on several deliverables; and she failed to provide adequate information about her programs to Jim Watkins, her direct supervisor.[162]   Plaintiff's co-workers at the GS-14 pay-grade, both male, received 1-block ratings ("Excellent") and awards of $1,800 and $2,200, based upon the extent of their responsibilities, the value of their accomplishments, and their higher levels of performance.[163]

Plaintiff filed multiple EEO Complaints over her 2009-2010 performance evaluation and award, but an Administrative Judge found in favor of the Army each time.[164]

### 4.   2010-2011 Evaluation and Award

New guidance from the Department of Defense caused awards for the 2010-2011 period to be more restricted for all employees.[165]   As a result, plaintiff received

---

[161] Ex. 1, GX 1 (Plaintiff's Interrogatory Response), no. 10; Ex. 83 (2009-2010 Evaluation), at 3622; Ex. 71 (Dr. Pierce's Declaration), at 3962.

[162] Ex. 80 (Watkins's Declaration), at 3909; Ex. 81 (Dr. Pierce's Declaration), at 3934; Ex. 82 (Watkins's Declaration), at 3915; Ex. 1, GX 30 (Watkins's Memorandum), at 163.

[163] Ex. 84 (Ratings and Awards), at 3667; Ex. 71 (Dr. Pierce's Declaration), at 3929-30; Ex. 80 (Watkins's Declaration), at 3915; Ex. 85 (Burger's Declaration), at 3946.

[164] Ex. 45 (EEO Decision), at 3867; Ex. 88 (EEO Decision), at 4038-59.

[165] Ex. 140 (Whitney's Testimony), at 3179.

a performance award of only $500 in July of 2011, despite the fact that he had been awarded a 2-block rating.[166]  Plaintiff was not awarded a 1-block ("excellent") rating because, among other things: she did not provide a "strong demonstration of stakeholder coordination"; she failed to assist in duties while serving as the Acting Division Chief; she did not exceed expectations with respect to the Models & Simulations roadmap; she did not exceed management control objectives on multiple occasions; and she did not exceed expectations in demonstrating a model or tool.[167] Although plaintiff was rated "excellent" in several categories, it was not enough to exceed the threshold for a 1-block rating.[168]

The only other GS-14 employee under the supervision of Kevin Crumlish, plaintiff's direct supervisor at that time, received $1,100 for a 1-block rating.[169]  The only other employee to receive a 1-block rating from Crumlish was Kelly Davis, a GS-11, but she did not receive a cash award, and was instead allowed 40 additional hours of annual leave.[170]

Plaintiff filed an EEO Complaint over her performance evaluation and award,

---

[166] Ex. 89 (2010-2011 Evaluation).

[167] Ex. 1, GX 12 (Crumlish's Declaration), at 1985-93; Ex. 90 (Whitney Memorandum), at 2005-06; Ex. 89 (2010-2011 Evaluation); Ex. 138 (Crumlish's Testimony), at 2910-15; Ex. 139 (Dr. Pierce's Testimony), at 3043-50, 3060-69.

[168] Ex. 89 (2010-2011 Evaluation).

[169] Ex. 137 (Plaintiff's Testimony), at 2779.

[170] Ex. 138 (Crumlish's Testimony), at 2950.

but an Administrative Law Judge found in favor of the Army.[171]

## H. Non-Selections

Vacancies periodically occurred in GS-15 positions.  When they did, standard procedures required the designation of *ad hoc* selection panels, a selecting official, and an approving authority.  Each selection panel included a female, a minority employee, and an individual from outside the Future Warfare Center.[172]  The Director of the Future Warfare Center worked with the chairperson of each selection panel to develop criteria and questions for the selection package, which were then submitted to the Civilian Personnel Advisory Center for approval.[173]  Candidates were rated, ranked, and interviewed by the panel, which forwarded its recommendations to the Personnel Office, Legal Department, and EEO Office.  The packages then were sent to the selecting authority for approval.[174]  Resumes were redacted to remove personal information, and did not include disability or EEO information.[175]  No panel member was directed to promote or exclude any particular candidate.[176]

---

[171] Ex. 67 (EEO Decision).

[172] Ex. 87 (Whitney's Declaration), at 3958; Ex. 92 (Carrithers's Declaration), at 5619.

[173] Ex. 146 (Burger's Testimony), at 6365-66; Ex. 163 (Burger's Testimony), at 10182.

[174] Ex. 91 (Lieutenant General Campbell's Declaration), at 5587; Ex. 147 (Kleefisch's Testimony), at 6610, 6612-14.

[175] Ex. 87 (Colonel Whitney's Declaration), at 3958.

[176] Ex. 92 (Carrithers's Declaration), at 5623; Ex. 38 (Dr. Tomkovich's Declaration), at 5638; Ex. 146 (Burger's Testimony), at 6368; Ex. 144 (Owens's Testimony), at 6187, 6191, 6204-06; Ex. 147 (Kleefisch's Testimony), at 6614; Ex. 149 (Wilson's Testimony), at 6701-02.

1.      **January 2008 Non-Selection**

A multi-disciplinary position for Director of the Simulations and Analysis Directorate of the Future Warfare Center was posted in late 2007.[177]  Twenty-three persons applied for the position, including plaintiff and Steve Fox.[178]  The selection panel was comprised of Col. David Cox, Dr. John Tomkovich, and Irene Lloyd from outside the Future Warfare Center.[179]  The selection panel was provided with

> the applicant resumes and documentation (names blanked out) required for the selection . . . along with approved selection criteria and a recording worksheet.  The [panel's] tasks were to review the 23 applicants' resumes against the 10 specified job tasks/skills and applicable education credentials. . . . Board members met on [December 18, 2007] and confirmed by consensus the top five applicants.

Ex. 97 (Selection Memorandum), at 290 (alterations supplied).  The selection panel interviewed the top five applicants, a group that included plaintiff, on January 16 and 17, 2008.[180]  Following all interviews, plaintiff was ranked fourth out of the five applicants.[181]  The selection panel recommended Dr. Steven Pierce, the highest scoring applicant, and submitted that recommendation to the approving official, Larry Burger.[182]  That recommendation was completed prior to the date on which plaintiff

---

[177] Ex. 97 (Selection Memorandum).

[178] *Id.* at 290.

[179] *Id.*

[180] *Id.*

[181] Ex. 3 (Col. Cox Statements), at 7153; Ex. 98 (Matrix Panel Scoring), at 8004-14.

[182] Ex. 1 (Plaintiff's Deposition), at 44; Ex. 97 (Selection Memorandum).

filed an informal complaint with the EEO Office.[183]

Burger concurred with the selection panel's recommendation on February 5, 2008.[184]  He subsequently stated that his selection of Dr. Steven Pierce was based upon the following factors:

> (1) The highest rated applicant by board review and interview processes of the independent selection board.

> (2) Strongest overall potential and background of the ten evaluated job tasks.

> (3) Significantly superior background conducting JCIDS analysis, support to concept development and experimentation programs as well as experience performing operational assessments that [have] significantly impacted Army-level decisions on space and missile defense programs.  These functions are the basis for the majority of work performed by the Simulation and Analysis Directorate.

> (4) He has demonstrated excellence in leadership as evidenced by his recent selection as the top graduate from the first Defense Acquisition Senior Service College Fellowship program and the achievements of his organization; program management as evidenced by the volume of products delivered by his division, and lastly, his expertise as in simulations and analysis where his credentials include a recent doctorate in operations research, DAWIA program management certification and a depth of experience in both missile defense and Army space operations.

Ex. 97 (Selection Memorandum), at 291.[185]  Prior to his selection, Dr. Pierce had

---

[183] Ex. 22 (Burger Statement); Ex. 151 (Burger's Testimony), at 8934.

[184] Ex. 97 (Selection Memorandum).

[185] Plaintiff contends that Dr. Pierce should not have been considered for the open position because his resume provides that he earned a Bachelor of Science degree from the United States

served as Chief of the Studies and Analysis Division of the Future Warfare Center.[186]

In contrast, plaintiff lacked both an earned Ph.D. degree and supervisory

experience.[187]

Plaintiff filed an EEO Complaint over her non-selection, but an Administrative

Law Judge found in favor of the Army.[188]

## 2.    January 2009 Non-Selection

A position for Chief of the Models & Simulations Division of the Future

Warfare Center was posted in late 2008, with a selection panel comprised of Melissa

Gilbert from outside the Future Warfare Center, Dr. John Tomkovich, and Dr.

Claudette Owens.[189]   Dr. Steven Pierce was the selecting official, and Larry Burger

---

Military Academy ("West Point") in 1977, majoring in Civil Engineering, but West Point was not
accredited by the Accreditation Board for Engineering and Technology until 1985.  *See* doc. no. 53
(First Response to Summary Judgment), at 98 ¶ 185.   Even so, the reason West Point was not
accredited was because West Point cadets were not authorized to declare an academic major prior
to   1985.   *See*   United   States   Military   Academy,   Modern   Era,   Wikipedia,
https://en.wikipedia.org/wiki/United_States_Military_Academy (last visited June 14, 2015).  Further,
plaintiff does not explain the importance of accreditation for purposes of the selection panel, and Dr.
Pierce earned a Master of Science degree majoring in Industrial Engineering from the Georgia
Institute of Technology, an MBA majoring in Financial Business Administration from Long Island
University, and a Ph.D. majoring in Industrial and Systems Engineering from the University of
Alabama in Huntsville.  *See* Ex. 165 (Dr. Pierce Resume).

[186] Ex. 165 (Dr. Pierce Resume).

[187] Ex. 9 (Cox's Declaration), at 7590; Ex. 151 (Burger's Testimony), at 8933; Ex. 164
(Plaintiff Resume).

[188] Ex. 45 (EEO Decision).

[189] Ex. 1 (Plaintiff's Deposition), at 47-48.

was the approving official.[190]  Candidates were scored by the selection panel, and the

candidates who attained scores greater than 60 were interviewed.[191]

Plaintiff scored less than 60.[192]  Jim Watkins, on the other hand, had the highest

combined score from the selection panel reviews and interview.[193]  In view of that,

Dr. Pierce endorsed Watkins for promotion to the position, saying that

> his knowledge and experience allow him to execute the mission in a
> timely and professional manner.  Mr. Watkins has a strong modeling and
> simulation background as demonstrated by his knowledge of the
> modeling aspects of military operations, force structure, equipment and
> doctrine; his experience as the Program Manager of Extended Air
> Defense Simulation (EADSIM); and his in-depth knowledge of the
> Modeling and Simulation configuration process.

Ex. 26 (Dr. Pierce Memorandum), at 7964.[194]   Burger approved Watkins's

selection.[195]

Plaintiff filed an EEO Complaint over her non-selection, but an Administrative

Law Judge found in favor of the Army.[196]

### 3.  June 2009 Non-Selection

---

[190] *Id.* at 48.

[191] *Id.* at 49.

[192] *Id.*

[193] Ex. 26 (Dr. Pierce Memorandum), at 7964.

[194] *See also* Ex. 74 (Burger's Declaration), at 8452; Ex. 100 (Watkins Resume).

[195] Ex. 1 (Plaintiff's Deposition), at 48-49.

[196] Ex. 45 (EEO Decision).

A GS-15 Supervisory Operations Research Analyst position was posted in June of 2009, with a selection panel comprised of Gisele Wilson from outside the Future Warfare Center, Dr. John Tomkovich, Dr. Claudette Owens, and David Carrithers serving as panel chair.[197]   Larry Burger was the selecting official, and Lieutenant General Kevin Campbell was the approving official.[198]   Eighteen blind resumes were submitted to and scored by the selection panel.[199]   The candidates' scores ranged between 18 and 36.[200]   Plaintiff scored 27, and she was one of eight candidates interviewed for the position.[201]   Each applicant was asked the same questions in the same order.[202]   Colonel David Cox received the highest score at the conclusion of all interviews, while plaintiff received the sixth highest score.[203]

The selection panel unanimously recommended Colonel David Cox to the panel chair, who endorsed that recommendation to Larry Burger, the selecting official.[204]   Colonel Cox was rated significantly higher than plaintiff in "experience,"

---

[197] Ex. 1 (Plaintiff's Deposition), at 50-51; Ex. 92 (Carrithers's Declaration), at 5619.

[198] Ex. 91 (Campbell's Declaration), at 5587-90.

[199] Ex. 103 (Selection Panel Worksheet), at 4779-90; Ex. 1, GX 21 (Carrithers Memorandum); Ex. 144 (Owens's Testimony), at 6171.

[200] Ex. 104 (Selection Panel Worksheet), at 4790.

[201] Id. at 4791-92; Ex. 149 (Wilson's Testimony), at 6693.

[202] Ex. 92 (Carrithers's Declaration), at 5618.

[203] Ex. 1 (Plaintiff's Deposition), at 51; Ex. 91 (Lieutenant General Campbell's Declaration), at 5591.

[204] Ex. 1 (Plaintiff's Deposition), at 51; Ex. 105 (Selection Memorandum); Ex. 92 (Carrithers's Declaration), at 5618.

because he had at least three years of supervisory experience, whereas plaintiff had none; he spent over two years directly reporting to a Senior Executive, whereas plaintiff had little, if any, experience directly advising Senior Executives; and he had more than two years of experience in managing the finances for an organization, whereas plaintiff had little experience in the management of current fiscal plans, or developing budgets for an organization.[205]  Burger endorsed the selection panel's recommendation, and Lieutenant General Kevin Campbell approved Colonel Cox for the position.[206]

Plaintiff filed an EEO Complaint over her non-selection, but an Administrative Law Judge found in favor of the Army.

### 4.    November 2010 Non-Selection

A position for Chief of the Models & Simulations Division of the Future Warfare Center was posted in November of 2008, with a selection panel comprised of Dr. Juanita Harris from outside the Future Warfare Center, Paul Page, and Dr. Melissa Gilbert (also from outside the Future Warfare Center).[207]  Dr. Steven Pierce

---

[205] Ex. 38 (Dr. Tomkovich's Declaration), at 5637-38; Ex. 92 (Carrithers's Declaration), at 5624; Ex. 144 (Owens's Testimony), at 6188-89; Ex. 91 (Lieutenant General Campbell's Declaration), at 5592; Ex. 106 (Plaintiff Resume); Ex. 107 (Colonel Cox Resume); Ex. 146 (Burger's Testimony), at 6369.

[206] Ex. 91 (Lieutenant General Campbell's Declaration), at 5590; Ex. 146 (Burger's Testimony), at 6355, 6357-60; Ex. 144 (Owens's Testimony), at 6185; Ex. 107 (Cox Resume), at 4771-4774; Ex. 149 (Wilson's Testimony), at 6696-98.

[207] Ex. 1 (Plaintiff's Deposition), at 54.

served as the selecting official.[208]  The selection panel received evaluation criteria for fifteen unidentified candidates, with scoring to be made on a 1-4 scale.[209]  Plaintiff ranked third among the top five applicants prior to interviews.[210]  After interviews, plaintiff ranked fourth with a combined score of 145.5.[211]  Kevin Crumlish, on the other hand, ranked first with a combined score of 177, and Dr. Pierce selected him for the position.[212]  Crumlish was determined to be the most qualified because: he received the highest score by the selection panel; he had a strong Modeling & Simulations background, with a demonstrated knowledge of military operations and force structure, equipment, and doctrine developments; he demonstrated success as the Program Manager of Extended Air Defense Simulations; and, he had extensive experience in modeling and Simulation Configuration Management.[213]

Plaintiff filed an EEO Complaint over her non-selection, but an Administrative Law Judge found in favor of the Army.[214]

## I.   Acting Division Chief Appointments

---

[208] *Id.*

[209] Ex. 108 (Report of Investigation), at 4062-64; Ex. 109 (Selection Materials), at 4145-47; Ex. 43 (Selection Panel Guide), at 4220-28.

[210] Ex. 109 (Selection Materials), at 4148.

[211] *Id.*; Ex. 110 (Gilbert Statement), at 4214-15.

[212] Ex. 1 (Plaintiff's Deposition), at 54; Ex. 109 (Selection Materials), at 4148.

[213] Ex. 112 ( Dr. Pierce Memorandum).

[214] Ex. 113 (EEO Decision).

An "Acting Division Chief" is appointed from time-to-time to perform the roles and responsibilities of a Division Chief when the Chief is absent, which may be no more than a single day.[215]  An Acting Division Chief is not an advertised position, and there is no automatic increase in pay associated with the appointment.[216]

When Jim Watkins became plaintiff's supervisor, he consulted with the Personnel Office, Legal Department, and Civilian Personnel Advisory Center for guidance in appointing an Acting Division Chief.  He decided to make his appointment based on the length of time served at a particular pay-grade:  a decision that placed plaintiff second in line for appointments behind John Morash.[217]  Even so, plaintiff was appointed Acting Division Chief several times.[218]  Human Resources confirmed that appointment of an Acting Division Chief is at the discretion of the manager, and that seniority provisions of the Union Bargaining Agreement do not apply to temporary supervisory appointments such as Acting Division Chief.[219]

Plaintiff filed multiple EEO Complaints — whenever Watkins failed to appoint

---

[215] Ex. 1 (Plaintiff's Deposition), at 56-58.

[216] *Id.* at 57-58.

[217] Ex. 80 (Watkins's Declaration), at 3907; Ex. 93 (Watkins's Emails), at 5721-25; Ex. 94 (Watkins's Declaration), at 5730.

[218] Ex. 1 (Plaintiff's Deposition), at 58-59; Ex. 1, GX 30 (Watkins Memorandum), at 156 (plaintiff was Acting Division Chief at least four times in 2009).

[219] Ex. 1, GX 23 (Lenier's Declaration), at 5740; Ex. 1, GX 22 (Tyson's Declaration), at 5766; Ex. 93 (Watkins Emails); Ex. 94 (Watkins's Declaration), at 5730; Ex. 96 (Burger's Declaration), at 5718-19.

her Acting Division Chief — but an Administrative Judge found in favor of the Army on each occasion.[220]

## J.   2009 Warfighter Source Selection Team

When a contract is bid, the Space & Missile Defense Center creates a "Source Selection Board."[221]  Typically, some employees from the division that will supervise the contractor's performance serve on the Source Selection Board.  Those division employees who do not serve on the Board have to carry the workload of the employees who do.[222]

The "Warfighter Source Selection Board" was composed of approximately fifteen persons whose function was "to select the contract winner for the War Fighter contract."[223]  The members of that Board were not selected through an advertised position announcement, and there was no automatic pay increase associated with a seat on the Board.[224]  Although plaintiff had been included on previous Source Selection Boards, she was not selected for the Warfighter Source Selection Board because all other members of that panel had more recent experience on the

---

[220] Ex. 45 (EEO Decision), at 3869; Ex. 88 (EEO Decision).

[221] Ex. 70 (Burger's Declaration), at 5706.

[222] *Id.*

[223] Ex. 1 (Plaintiff's Deposition), at 55-56; Ex. 101 (Baker's Declaration), at 5669-70.

[224] Ex. 1 (Plaintiff's Deposition), at 56.

47

requirements of the contract that was to be advertised for bids.[225]  Two members of the Models & Simulations Division, including plaintiff, were not selected to serve on the Board, in order to continue performance on the work assigned to that Division.[226]

Plaintiff filed an EEO Complaint over her failure to be selected, but an Administrative Law Judge found in favor of the Army.[227]

### K.   **Plaintiff's Projects and Funding**

Funding allocations are generally made based on customer requirements, the amount of funds available, and the priorities of the Command and Future Warfare Center.[228]  During 2009, all Model & Simulation Division programs were operating below required levels of funding.[229]  When Jim Watkins served as plaintiff's supervisor, most of her projects started at roughly the $500,000 range, which rendered them "non-startable" because of budget constraints.[230]  Even so, Watkins allocated an additional $50,000 to plaintiff's projects that year, and other GS-14s received lower amounts of requested funds.[231]  When one of plaintiff's projects lost

---

[225] Ex. 70 (Burger's Declaration), at 5706-07; Ex. 148 (Baker's Testimony), at 6665-66; Ex. 101 (Baker's Declaration), at 5669; Ex. 102 (Source Selection Board Information).

[226] Ex. 70 (Burger's Declaration), at 5706.

[227] Ex. 45 (EEO Decision).

[228] Ex. 54 (Watkins's Letter), at 4652; Ex. 141 (Dr. Pierce's Testimony), at 5982; Ex. 146 (Burger's Testimony), at 6383-85.

[229] Ex. 54 (Watkins's Letter), at 4652.

[230] Ex. 142 (Watkins's Testimony), at 6076-77.

[231] *Id.* at 6077-81.

funding, Dr. Steven Pierce compensated her by not rating her on a related objective.[232]

Plaintiff filed an EEO Complaint regarding her lack of funding, but an Administrative Law Judge found in favor of the Army.[233]

## L.   **Timecard Delay**

An issue with plaintiff's timecard arose in 2008, "during the week of Thanksgiving[,] when timelines were compressed for approval of timecards."[234]

> [Plaintiff], along with 36 other [Space & Missile Defense Center] employees (19 in [the Future Warfare Center]) received an email from a clerk in the command's G-1 office on Tuesday of Thanksgiving week stating that their timecards were not yet in the system and they needed to take action to ensure they would get paid.  Management took action to address all timecard concerns *and all employees were paid on time*. . . . *No special action was necessary for* [*plaintiff's*] *timecard*; they were all addressed as a group."

Ex. 74 (Burger's Declaration), at 8457-58 (alterations and emphasis supplied).

Plaintiff, nevertheless, filed an EEO Complaint over the issue, but an Administrative Law Judge found in favor of the Army.[235]

## M.   **Team-Building Exercise**

Plaintiff approached Dr. Steven Pierce in 2009 about conducting a "team-

---

[232] Ex. 162 (Plaintiff's Testimony), at 9509.

[233] Ex. 45 (EEO Decision).

[234] Ex. 74 (Burger's Declaration), at 8457 (alteration supplied); Ex. 162 (Plaintiff's Testimony), at 9688.

[235] Ex. 45 (EEO Decision).

building exercise" that involved blindfolding all team members in the room except for plaintiff.[236]  While team-building was a performance review standard, there was no specific requirement to conduct a team-building exercise.[237]  Other employees expressed discomfort regarding plaintiff's proposed exercise, so Dr. Pierce exercised his discretion to deny the request.[238]  Plaintiff filed an EEO Complaint over his denial of her request, but an Administrative Law Judge found in favor of the Army.[239]

## N.  Plaintiff's Complaints Up the Chain of Command

It is a policy of the Department of Defense that all employees should not burden the EEO process by attempting to resolve all complaints at the lowest possible level.[240]  Even so, on numerous occasions plaintiff lodged complaints many levels up the chain of command.[241]  In most instances, Lieutenant General Kevin Campbell and Lieutenant General Richard Formica, both commanding officers of the Space & Missile Defense Center at various times, and Larry Burger, who was approximately four levels up the chain of command from plaintiff, would either refer her complaint to a lower level, investigate it, or defer to the EEO process in those instances in which

---

[236] Ex. 162 (Plaintiff's Testimony), at 9595; Ex. 168 (Dr. Pierce Memorandum), at 4516.

[237] Ex. 141 (Dr. Pierce's Testimony), at 5986.

[238] Ex. 162 (Plaintiff's Testimony), at 9462-63.

[239] Ex. 45 (EEO Decision).

[240] Ex. 162 (Plaintiff's Testimony), at 9665.

[241] *See* Ex. 114 (Email to LTG Campbell); Ex. 115 (Email to LTG Campbell); Ex. 116 (Email to Johnetta Graves).

plaintiff had previously filed an EEO complaint.[242]  Plaintiff included her issues with

complaining up the chain of command in an EEO complaint, but an Administrative

Law Judge found in favor of the Army.[243]

**O**.     **The Space & Missile Defense Center's EEO and Anti-Harassment Policies**

The Space & Missile Defense Center maintains published policies regarding

EEO activity and harassment.[244]  The anti-harassment policy is required reading for

all personnel.[245]  All EEO and anti-harassment policies are posted on office bulletin

boards and organizational websites, and are subject to annual inspection.

Additionally, the Army provides a "hotline" for anonymous reporting of

misconduct.[246]  The anti-harassment policy defines sexual harassment, and instructs

employees to "make it clear that such behavior is unwelcome and offensive, and

report the harassment to the appropriate supervisor or the [EEO] Office or EEO

counselor."[247]     New employees are required to take "Prevention of Sexual

---

[242] Ex. 117 (Lieutenant General Campbell's Declaration), at 3971; Ex. 118 (LTG Campbell Memorandum), at 4909-10; Ex. 91 (Lieutenant General Campbell's Declaration), at 5594-95; Ex. 96 (Burger's Declaration), at 5720.

[243] Ex. 45 (EEO Decision).

[244] Ex. 1 (Plaintiff's Deposition), at 27; Ex. 1, GX 2 (Harassment Memorandum); Ex. 119 (Harassment Policy); Ex. 120 (EEO Memorandum); Ex. 121 (EEO Memorandum).

[245] Ex. 1, GX 2 (Harassment Memorandum), at 6912, ¶ 6.

[246] Ex. 1 (Plaintiff's Deposition), at 28-29; Ex. 1, GX 2 (Harassment Memorandum), at 6912, ¶ 5; Ex. 129 (Burger's Testimony), at 794-95; Ex. 117 (Lieutenant General Campbell's Declaration), at 3970.

[247] Ex. 1, GX 2 (Harassment Memorandum), at 6910-11, ¶¶ 2-3 (alteration supplied).

Harassment" training, with refresher training provided biennially.[248]  Training was offered both live and through online media.[249]  The Space & Missile Defense Center's EEO Office monitored all training.[250]

A Space & Missile Defense Center employee may report any misconduct to her supervisor, all the way up the chain of command to the Secretary of Defense, or she may go outside to the Office of Special Counsel.[251]  The Army provides counselors at the Employee Assistance Center, free of charge, to all employees.[252]

Upon her arrival at the Space & Missile Defense Center in 2002, plaintiff received sexual harassment training every two years, and she knew to report misconduct to the EEO Office.[253]

## P.   Colonel Peter Cole

Peter Cole, a retired Army Colonel, executed a declaration on November 3, 2014, which reads as follows:

> My name is Peter C. Cole and I am a Retired Army Colonel in the Grade of 06.
>
> From December 2006 to December 2008 I was assigned to the US

---

[248] *Id.* at 6911, ¶ 4.

[249] Ex. 1 (Plaintiff's Deposition), at 28.

[250] *Id.*

[251] *Id.* at 29.

[252] *Id.* at 26-27.

[253] Ex. 162 (Plaintiff's Testimony), at 9427.

52

Army Space and Missile Defense Command (SMDC), Future Warfare Center (FWC) as Chief of the Missile Defense Branch.  Mr. Larry Burger was the Senior Executive Service (SES) in charge of the Future Warfare Center.

Prior to today I have provided 2 other declarations submitted as Evidentiary Material at Ex 186, 207 and I reaffirm the truth of those Declarations as if fully set out herein.

1.   I attended most FWC staff meetings and performed all duties assigned by Mr. Burger. I had the opportunity on a daily basis to observe Larry Burger's management style and the methods he used to keep control of his Center.

2.   I personally observed Larry Burger maintain a position of enhanced power in the agency beyond what would be normal for a Center Director.

3.   I observed and witnessed Larry Burger's use of political connections to obtain funding for SMDC programs beyond his Center. His ability to work the political side to obtain initial as well as supplemental appropriations was the basis of his power.

4.   Larry Burger had connections with Richard Shelby a very powerful Republican Senator who is currently the Ranking Member of the Senate Banking Committee. During some of the time relevant Senator Shelby was Chairman of the Banking Committee.

5.   Shortly after I was assigned to SMDC Larry Burger took me aside and explained how things worked at SMDC. One of the methods to raise contributions for Senator Shelby was the process known in the vernacular as "congressional plus ups".  A "congressional plus up" was an enlargement of a regular appropriation earmarked for a specific contractor on a specific program.

6.   I was subsequently invited into meetings with Larry Burger and

53

members of Mr. Burger's Staff in which I overheard conversations between Senator Shelby, Mr. Burger, Shelby's Chief of Staff and members of Mr. Burger's staff concerning which contractors would be considered for "congressional plus ups."

7.    In these meetings that I attended certain contractor Executives who were members of the "Gray Beards" would be considered for and did obtain substantial increases to their contracts by way of "congressional plus ups[.]"

8.    The "Gray Beards" were essentially donation bundlers who combined donations from company employees and others for Senator Shelby. They would hold private fund raisers and solicited contributions from individuals in the community.  One of the leaders was Retired LTG Jay Garner[,] former SMDC Commander.

9.    I observed Mr. Burger use his "Wolf Pack" pattern of retaliation that was identical in every case. He fabricates investigations and perjures testimonies from his FWC subordinates to support the false allegations and ruin careers. His subordinates receive various benefits including promotions and bonuses as well as protection. Mr. Burger formed his 'Wolf Pack' to attack and destroy the careers of females and minorities he wishes to discredit or eliminate from FWC. Mr. Burger directed me to eliminate a female named Linda Cook from FWC for patently false reasons. Mr. Burger also directed me to eliminate a highly professional Hispanic employee for similar reasons.

10.    I believed Mr. Burger's instructions to be akin to a 'gang initiation ritual' where the new supervisor had to prove his loyalty to Mr. Burger.

11.    In a February 6, 2008 meeting with me, Mr. Burger, and COL Bruce Smith, Mr. Burger was asked if he was aware of the "Wolf Pack". Mr. Burger replied he knew all about the "Wolf Pack" and

that he was their leader.

12.     I personally observed the manner in which Burger and his "Wolf
        Pack" treated Linda Beach and Pam Caruso, female employees in
        the FWC. It was the same pattern and practice used by the "Wolf
        Pack". In Dec 2006 as Linda Beach's new supervisor I was
        instructed to get rid of Linda Beach. Kirby Brown, Burger['s]
        fellow "Wolf Pack" member, faxed me several pages of their
        version of Linda Beach's March 2005 contract actions and what
        they had done to her so far. There was no doubt in my mind that
        this was a test to show I was a team player.

13.     In February 2007, Linda Beach was removed from her GS-14
        term position, and downgraded to a GS-13 while she continued to
        do the same work.

14.     Ultimately, on February 27, 2009, Linda Beach was returned to
        her parent agency. Linda Beach was told that FWC didn't have
        funds and that was why she was returned. The Department of
        Justice told Linda Beach in July 2014 that she was removed for
        a false degree. But no investigation was done prior to her
        removal. And while Linda Beach's degree was unaccredited as
        she noted, no action was taken against the West Point falsely
        recorded engineering degrees for FWC supervisors Steven Pierce,
        Jack Tompkovich, and David Cox. In addition, the SMDC Deputy
        Commander, SES Steve Messervy, was selected based on his
        unaccredited Southeastern Institute Technology degree. No action
        was taken against any FWC "Wolf Pack" members including
        Steven Pierce, David Cox or Jack Tompkovich who all graduated
        from West Point prior to 1985. As a West Point graduate I have
        actual knowledge that West Point did not award any Engineering
        Degrees until 1985.

15.     In May 2007 COL David Cox and Mr. Burger were notified that
        a FWC married male contractor was having sex with a married
        female federal employee in the FWC work area where security
        cameras caught them in the act. While the video evidence was

provided to COL Cox and Mr. Burger no action was taken by them.

16.   COL David Cox told me on or about January 7, 2008 "PETER YOU NEED TO BACK OFF BECAUSE WE HAVE THE WOLF PACK." Just prior to this dire warning I had been told on January 4, 2008 by Mr. John Robinson that he overheard a discussion between COL David Cox and Mr. Burger on how to get rid of me. In addition, Mr. Robinson overheard Mr. Burger give COL Cox the direct order to have Mr. Ed Garcia make false statements against me with a promise that Mr. Garcia would get my FWC position. I also received two calls from Michelle Smith, my administrative officer, and Mr. Mike Leech, intelligence analyst, telling me that Mr. Garcia had been seeking to get false statements against me for a "Wolf Pack" action. Furthermore, Mr. Garcia assured them that shortly he would have my FWC position.

17.   During this time I was sharing information with COL Glenwood Norris, SMDC Inspector General.

18.   COL Norris and I discovered a number of contractor warehouses with tens of millions of dollars of unaccounted for Army major end items such as vehicles, shelters, communications systems, generators, and much more that Mr. Burger had failed to transfer to a government hand receipt (SF-250) so all this equipment was under government control. Mr. Burger was allowing the contractors to use any of this Army funded equipment as they wished to include keeping it at their homes.

19.   Other than being directed by the SMDC Commander LTG Campbell to "fix it" no disciplinary or criminal action was taken against Mr. Burger.

20.   In January 2008, Burger appointed COL William Whitney to conduct an AR 15-6 Investigation into Alesya Pascal's sexual harassment complaint. I have personal knowledge that COL

Whitney and Mr. Burger knew that COL Whitney was to be his new, [sic] FWC deputy. Mr. Burger told COL Whitney who to interview as COL Whitney reports on the first page of his report. This Larry Burger "Command Influence" fatally flaws this AR 15-6 Investigation and all other Larry Burger instigated investigations marshalled [sic] against Alesya Pascal.

21.   COL Whitney failed to report in his AR 15-6 investigation that nude photos were in the FWC workplace to his chain of command, as required.

Doc. no. 54-7 (Colonel Cole's Declaration), at ECF 42-47 (alterations supplied).[254]

## IV.  DISCUSSION

Title VII provides the exclusive remedy for a federal employee who alleges discrimination based upon race, color, religion, sex, or national origin, as well as retaliation for protected activity. *See* 42 U.S.C. § 2000e–16; *Brown v. General Services Admin.*, 425 U.S. 820, 829-33 (1976) (observing that Title VII provides the "exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination"); *United States v. Fausto*, 484 U.S. 439 (1988); *Canino v. U.S. E.E.O.C.*, 707 F.2d 468, 472 (11th Cir. 1983).

---

[254] Plaintiff cites to Exhibit 213 as Colonel Cole's declaration.  Although an Exhibit 213 exists, unlike several other exhibits purportedly attached by plaintiff, it is simply a cover page labeled "Peter Cole's October 2014 Declaration."  *See* Ex. 213.  The table of contents for plaintiff's exhibits describes Exhibit 213 as "Peter Cole's October 31, 2014 Declaration."  *See* doc. no. 54-1 (Table of Contents), at ECF 2.  The court assumes that the November 3, 2014 declaration is the exhibit to which plaintiff cites in her second response to summary judgment, albeit some assertions in plaintiff's brief do not appear in the attached declaration, *see* doc. no. 60 (Second Response to Summary Judgment), ¶ 11, and the cited paragraph numbers appear different. *Compare id.* ¶ 14, *with* doc. no. 54-7 (Colonel Cole's Declaration), at ECF 44-45, ¶ 12.

57

The Rehabilitation Act provides the exclusive remedy for a federal employee asserting a disability discrimination claim. *See Van Purr v. Geithner*, No. 1:11-CV-227, 2012 WL 2890449, at *1 n.1 (N.D. Fla. June 8, 2012) (construing federal employee's *pro se* disability discrimination action as falling under the Rehabilitation Act), *report and recommendation adopted*, No. 1:11-CV-227, 2012 WL 2890346 (N.D. Fla. July 16, 2012).

"Under Title VII and the Rehabilitation Act, federal employees are required to initiate administrative review of any alleged discriminatory or retaliatory conduct with the appropriate agency within 45 days of the alleged discriminatory act."[255] *Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2008). "Generally, when the claimant does not initiate contact within the 45–day charging period, the claim is barred for failure to exhaust administrative remedies." *Id.*

> A complainant who has filed an individual complaint [with an agency] . . . is authorized under title VII, the ADEA and the Rehabilitation Act to file a civil action in an appropriate United States District Court:
>
>> (a) Within 90 days of receipt of the final action on an individual or class complaint if no appeal has been filed;
>>
>> (b) After 180 days from the date of filing an individual or class complaint if an appeal has not been filed and final action has not

---

[255] "This requirement is not a technicality; rather, it is part and parcel of the congressional design to vest in the federal agencies and officials engaged in hiring and promoting personnel primary responsibility for maintaining nondiscrimination in employment." *Grier v. Secretary of Army*, 799 F.2d 721, 724 (11th Cir. 1986) (quotations omitted).

been taken;

(c) Within 90 days of receipt of the Commission's final decision on an appeal; or

(d) After 180 days from the date of filing an appeal with the Commission if there has been no final decision by the Commission.

29 C.F.R. § 1614.407.  *See also* 42 U.S.C. § 2000e–16(c).

Although defendant does not raise the issue of the timeliness of plaintiff's numerous claims, many of the events that form the basis of plaintiff's claims occurred years prior to the filing of the present action.  Further, an EEO Decision for one of plaintiff's claims was rendered over a year before she filed her complaint.[256] Nevertheless, because this court has determined that plaintiff's claims fail on their when considered on their merits, it will not, on its own, raise the issue of the timeliness of plaintiff's various claims.

## A.   Revocation of Plaintiff's Security Clearance

The first claim this court will address is plaintiff's assertion that the temporary revocation of her security clearance pending an investigation was discriminatory and in retaliation for her complaints of sexual harassment.  Defendant asserts that this court does not have jurisdiction to adjudicate plaintiff's claims regarding her security

---

[256] *See* Ex. 45 (EEO Decision).

clearance because the issuance or revocation of a security clearance is within the

exclusive purview of the federal agency.  The Supreme Court held in *Department of*

*Navy v. Egan,* 484 U.S. 518 (1998), that the Merit Systems Protection Board did not

have the authority to review a decision by the Navy to revoke the security clearance

(and, effectively, terminate the employment) of a civilian employee.  *Id.* at 520.  The

Court reasoned as follows:

> It should be obvious that no one has a "right" to a security
> clearance.  The grant of a clearance requires an affirmative act of
> discretion on the part of the granting official.  The general standard is
> that a clearance may be granted only when "clearly consistent with the
> interests of the national security."  *See, e.g.*, Exec. Order No. 10450, §§
> 2 and 7, 3 CFR 936, 938 (1949-1953 Comp.); 10 CFR § 710.10(a)
> (1987) (Department of Energy); 32 CFR § 156.3(a) (1987) (Department
> of Defense).  A clearance does not equate with passing judgment upon
> an individual's character.  Instead, it is only an attempt to predict his
> possible future behavior and to assess whether, under compulsion of
> circumstances or for other reasons, he might compromise sensitive
> information.  It may be based, to be sure, upon past or present conduct,
> but it also may be based upon concerns completely unrelated to conduct,
> such as having close relatives residing in a country hostile to the United
> States.  "[T]o be denied [clearance] on unspecified grounds in no way
> implies disloyalty or any other repugnant characteristic."  *Molerio v.*
> *FBI*, 242 U.S. App. D.C. 137, 146, 749 F.2d 815, 824 (1984).  The
> attempt to define not only the individual's future actions, but those of
> outside and unknown influences renders the "grant or denial of security
> clearances . . . an inexact science at best."  *Adams v. Laird*, 136 U.S.
> App. D.C. 388, 397, 420 F.2d 230, 239 (1969), *cert. denied*, 397 U.S.
> 1039, 90 S. Ct. 1360, 25 L. Ed.2d 650 (1970).
>
> Predictive judgment of this kind must be made by those with the
> necessary expertise in protecting classified information.  For "reasons

. . . too obvious to call for enlarged discussion," *CIA v. Sims*, 471 U.S. 159, 170, 105 S. Ct. 1881, 1888, 85 L. Ed.2d 173 (1985), the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it. Certainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence. Nor can such a body determine what constitutes an acceptable margin of error in assessing the potential risk. The Court accordingly has acknowledged that with respect to employees in sensitive positions "there is a reasonable basis for the view that an agency head who must bear the responsibility for the protection of classified information committed to his custody should have the final say in deciding whether to repose his trust in an employee who has access to such information." *Cole v. Young*, 351 U.S. 536, 546, 76 S. Ct. 861, 868, 100 L. Ed. 1396 (1956). As noted above, this must be a judgment call.

*Egan,* 484 U.S. at 528-29 (alterations in original).

The Eleventh Circuit clarified its position on the reviewability of security clearance decisions in *Hill v. White,* 321 F.3d 1334 (11th Cir. 2003). In that case, a civilian employee of the United States Army alleged that he had been denied a security clearance on the basis of his age. Specifically, he alleged that

his supervisor initiated disciplinary proceedings against him for charges that he says were false and frivolous and motivated by a desire to discriminate against him because of his age. Plaintiff was suspended for three days pursuant to a final administrative decision. He was required to undergo a mental evaluation and then his security clearance was suspended.

*Hill,* 321 F.3d at 1335. The plaintiff in *Hill* — presumably in an effort to bypass

61

*Egan*'s ban on judicial review of security clearance decisions — did not purport to challenge the Army's decision to suspend his security clearance. Instead, he challenged "the initiation of the security clearance investigation, claiming it was *improperly motivated* by discrimination." *Id.* (emphasis supplied). The Eleventh Circuit agreed with a decision of the Fourth Circuit which held that "'[the] distinction between the *initiation of* a security investigation and the *denial of* a security clearance is a distinction without a difference.'" *Id.* at 1335-36 (quoting *Becerra v. Dalton*, 94 F.3d 145 (4th Cir. 1996)) (alteration in original, emphasis supplied). The Eleventh Circuit emphasized that:

> The United States Supreme Court has made clear that a decision concerning the issuance or non-issuance of security clearance is a matter within the purview of the executive and not to be second-guessed by the judiciary unless Congress has specifically provided otherwise. *Department of the Navy v. Egan*, 484 U.S. 518, 108 S .Ct. 818, 98 L. Ed. 2d 918 (1988). To review the initial stages of a security clearance determination is to review the basis of the determination itself regardless of how the issue is characterized.

*Hill,* 321 F.3d at 1336.

The *Hill* decision cannot be avoided. Like *Hill,* this case involves a claim that plaintiff's security clearance was temporarily revoked pending an investigation motivated by unlawful discrimination and a desire to retaliate for plaintiff's complaints of sexual harassment. This court does not have jurisdiction to review the

temporary suspension of plaintiff's security clearance.  Accordingly, it also does not have jurisdiction over her discrimination and retaliation claims based upon that suspension.  *Hill,* 321 F.3d at 1336.  Summary judgment is due to be granted in defendant's favor on those claims.

### B.   **Plaintiff's Sexual Harassment Claim**

To succeed on a sexually-hostile work environment claim, a plaintiff must show that:  (1) she belongs to a group protected by Title VII; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon her sex; (4) the harassment was sufficiently severe or pervasive as to alter the terms and conditions of her employment; and (5) there is a basis for holding defendants responsible under a theory of either vicarious or direct liability.  *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 751; *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 508 (11th Cir. 2000).  The first three elements of such a claim cannot be disputed under the facts of this case.  As a female, plaintiff belongs to a group protected by Title VII.  *See Henson v. City of Dundee,* 682 F.2d 897, 903 (11th Cir. 1982) ("As in other cases of sexual discrimination this [element] requires a simple stipulation that the employee is a man or a woman.") (alteration supplied).  Plaintiff also has testified that she was subjected to boorish comments and offensive behavior relating to her sex by Steve

63

Fox, Chief of the Models & Simulations Division, and that she found such behavior to be unwelcome.

As the Eleventh Circuit has observed, however, "a plaintiff's *subjective feelings* and personal reactions are *not* the complete measure of whether conduct is of a nature that it interferes with job performance. If it were, the most unreasonably hypersensitive employee would be entitled to more protection than a reasonable employee." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) (emphasis supplied). Thus, the fourth element of a hostile work environment claim contains both *an objective* and *a subjective* component. To be actionable under Title VII, the behavior complained of must result in a work environment "that a reasonable person would find hostile or abusive," as well as an environment that the victim "subjectively perceive[s] . . . to be abusive." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993) (alteration supplied); *see also, e.g., Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (same); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d at 509 ("Harassment is severe or pervasive for Title VII purposes *only if* it is *both* subjectively *and* objectively severe [or] pervasive.") (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (emphasis and alteration supplied).

Conduct that is not severe or pervasive enough to create *an objectively*

64

> hostile or abusive work environment — an environment that a
> reasonable person would find hostile or abusive — is beyond Title VII's
> purview.  Likewise, if the victim does not subjectively perceive the
> environment to be abusive, the conduct has not actually altered the
> conditions of the victim's employment, and there is no Title VII
> violation.

*Harris*, 510 U.S. at 21-22 (emphasis supplied).

As the Supreme Court explained in *Faragher v. City of Boca Raton*, the objective component of the severe or pervasive element is intended to prevent "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" from falling under Title VII's broad protections.  524 U.S. at 788; *see also Gleason v. Mesirow Financial, Inc*., 118 F.3d 1134, 1144 (7th Cir. 1997) (observing that Title VII is "'not designed to purge the workplace of vulgarity,' for a certain amount of 'vulgar banter, tinged with sexual innuendo' is inevitable in the modern workplace, particularly from 'coarse and boorish workers'") (quoting *Baskerville v. Culligan International Co*., 50 F.3d 428, 430-31 (7th Cir. 1995)).

When evaluating the objective severity of the conduct complained of, courts consider, among other factors, the frequency of the conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and whether the conduct unreasonably interferes with the

employee's job performance.  *See*, *e.g.*, *Miller*, 277 F.3d at 1276 (citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (in turn citing *Harris*, 510 U.S. at 23[257])); *Gupta*, 212 F.3d at 584; *Mendoza*, 195 F.3d at 1246.

District courts are compelled to carefully compare the four enumerated factors to the conduct complained of by a plaintiff, so as to avoid "trivializ[ing] true instances of sexual harassment."  *Mendoza*, 195 F.3d at 1252 n.10 (alteration supplied).  "These factors . . . delineate a minimum level of severity or pervasiveness necessary [as a matter of law] for harassing conduct to constitute discrimination in violation of Title VII."  *Id.* at 1246 (alteration supplied).[258]  If district courts allow hostile work environment claims to go forward on the basis of facts that do not demonstrably meet or exceed the enumerated standards, that "would lower the bar of

---

[257] Speaking for a unanimous court in *Harris v. Forklift Systems*, Justice O'Connor said that the issue of

> whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.  But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

[258] In *Mendoza*, an *en banc* Court determined that the conduct complained of by the plaintiff was "*insufficient as a matter of law* to sustain hostile-environment claims."  195 F.3d at 1252 & n.10 (emphasis supplied).

66

Title VII to punish mere bothersome and uncomfortable conduct, and would 'trivialize true instances of sexual harassment.'" *Gupta*, 212 F.3d at 586 (quoting *Mendoza*, 195 F.3d at 1252 n.10).

"It is not enough that a supervisor or coworker fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor.  Such failures are too commonplace in today's America, regardless of the sex of the employee, to be classified as discriminatory." *Minor v. Ivy Tech State College*, 174 F.3d 855, 858 (7th Cir. 1999).

In fact, the "mere utterance" of sexually explicit epithets and derogatory statements "which engender offensive feelings in an employee" is *not* actionable. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971)).  That is because "Title VII does not attempt to purge the workplace of vulgarity," *Hopkins v. Baltimore Gas and Electric Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (internal quotation marks and citation omitted), nor did Congress "expect employers to purify the language in the workplace or remove all vulgarity or coarse comments." *Johnson v. Hondo, Inc.*, 940 F. Supp. 1403, 1410 (E.D. Wis. 1996).  Moreover, conduct which amounts to "mere locker room antics, joking, or horseplay" also is beyond the purview of Title VII. *Tietgen v. Brown's Westminster*

67

*Motors, Inc.*, 921 F. Supp. 1495, 1501 (E.D. Va. 1996).[259]

Applying the foregoing principles to the facts of this case, the court concludes that the record does not demonstrate that a reasonable person would find the conduct of which plaintiff complains to have been sufficiently "severe or pervasive." While the comments of Steve Fox's were *inappropriate*, the occasional comments he made over the course of a year were not *frequent*. *Compare Guthrie v. Waffle House, Inc.*, 460 F. App'x 803, 807 (11th Cir. 2012) (holding that "a few dozen comments or actions . . . spread out over a period of eleven months" are not sufficient to be characterized as *frequent*), *with Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 804 (11th Cir. 2010) (holding that the objectionable conduct complained of by plaintiff *was* sufficiently frequent when it occurred on a daily basis for more than three years); *Miller*, 277 F.3d at 1276 (harassing conduct sufficiently frequent where it occurred "three or four times a day" over the course of a month); *Dees v. Johnson*

---

[259]*See also Baskerville v. Culligan International Co.*, 50 F.3d 428, 430 (7th Cir. 1995) ("A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage."); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (relatively isolated incidences of non-severe conduct do not rise to the level of a hostile environment); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987) (to be deemed pervasive, the conduct must be more than episodic; it must be sufficiently continuous and concerted), *overruled on other grounds by Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S. Ct. 2362, 105 L. Ed. 2d 132 (1989); *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983) (isolated incidents generally not sufficient to create hostile working environment); *Christoforou v. Ryder Truck Rental*, 668 F. Supp. 294, 301 (S.D. N.Y. 1987) (Although the level of behavior needed to create a hostile environment "cannot be precisely defined," it is "clearly more abusive, pervasive and persistent" than three specific incidents of sexual harassment over an 18 month period.).

*Controls World Services, Inc.*, 168 F.3d 417, 418 (11th Cir. 1999) ("almost-daily abuse" over the course of three years was sufficiently frequent).

Moreover, plaintiff has not shown that Fox's conduct was sufficiently "severe": that is, that it created "a workplace that [was] permeated with discriminatory intimidation, ridicule and insult." *Miller*, 277 F.3d at 1267-77 (alterations supplied). Even though the comments attributed to Fox could be characterized as rude, disrespectful, or unprofessional, they did not create an environment that was "permeated with discriminatory intimidation, ridicule, and insult." *Id.* Indeed, the Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *See, e.g., Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *Harris*, 510 U.S. at 21-22.[260]

It also is clear that the conduct complained of by plaintiff was not physically threatening, and it cannot be characterized as "humiliating" when compared to Eleventh Circuit precedent. *See e.g., Reeves*, 594 F.3d at 804, 811-12 (conduct was sufficiently "humiliating" where it included use of the terms "whore," "bitch," and

---

[260] For example, the Eleventh Circuit has found that a female plaintiff was not subjected to a sex-based hostile work environment where a male supervisor (1) told her he was "getting fired up," (2) rubbed his hip against her hip while smiling and touching her shoulder, (3) twice made a sniffing sound while looking at employee's groin area, and (4) constantly followed her and stared at her in a very obvious manner. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247 (11th Cir. 1999), *cert. denied*, 529 U.S. 1068 (2000).

"cunt," as well as "vulgar" discussions of women's breasts, nipples, and buttocks, and an employee displaying "a pornographic image of a fully naked woman with her legs spread, exposing her vagina"); *Miller*, 277 F.3d at 1277 (conduct was sufficiently "humiliating" where supervisor and other co-workers shouted ethnic slurs and derogatory names at the plaintiff in an intimidating manner during the course of berating him for his job performance, or when they were "arguing with him," were "mad with him," or were "taunting him").

For all of the foregoing reasons, summary judgment is due to be granted in defendant's favor on plaintiff's sexually-hostile work environment claim.

## C. **Plaintiff's Gender Discrimination, Disability, and Retaliation Claims**

Plaintiff also asserts numerous claims contending that she was discriminated against on the basis of her gender (female) and her disability (perceived head trauma), as well as being subjected to retaliation because of her protected conduct (EEO Complaints). Plaintiff attempts to establish each of those claims through the use of circumstantial evidence. Federal courts evaluate the sufficiency of such evidence using some variant of the analytical framework announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See also, e.g.*, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993); *Chapman v. AI Transport*,

70

229 F.3d 1012, 1024 (11th Cir. 2004) (*en banc*); *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998); *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501 (11th Cir. 1990). Under that familiar framework, a plaintiff must first establish a *prima facie* case of disparate treatment on the basis of her sex or perceived disability, or retaliation. If she does so, that gives rise to a presumption of discrimination or retaliation. To rebut that presumption, the employer must articulate a legitimate, nondiscriminatory (or nonretaliatory) reason for the contested employment action. If the employer does so, the presumption of discrimination or retaliation drops from the case, and the burden shifts back to the plaintiff to show that the employer's proffered reason is merely a pretext for unlawful discrimination or retaliation. *See, e.g.*, *McDonnell Douglas*, 411 U.S. at 802–05; *Burdine*, 450 U.S. at 252–56.

An element common to all such *prima facie* cases — regardless of whether it is a gender discrimination claim, a disability claim, or a retaliation claim that is under consideration — is the requirement for the plaintiff to prove that the discriminatory conduct complained of resulted in an "adverse employment action": *that is*, an action that had "some *tangible, negative effect* on the plaintiff's employment." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) (emphasis supplied)

71

(ADA retaliation claim).[261]  The "classic and ultimate 'tangible employment action,'" of course, is termination of a person's employment.  *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1246 n.18 (11th Cir. 1998).  Other "patently adverse" employment actions short of termination include "demotion, reduction in pay, loss of prestige, or diminishment of responsibilities."  *Doe v. Dekalb County School District*, 145 F.3d 1441, 1448 (11th Cir. 1998) (discussing standards for determining "adverse" employment actions in context of an ADA transfer claim).[262]  Actions falling short of those benchmarks either are difficult to peg, or are not actionable.

---

[261]*See also, e.g.*, *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (holding, in context of Title VII retaliation claim, that "[a]n adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'") (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)).  *Cf. Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 2268, 141 L. Ed. 2d 633 (1998) (holding, in context of Title VII sexual harassment claim, that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").

[262]"Where a plaintiff has allegedly suffered termination, demotion, reduction in pay, loss of prestige, or diminishment of responsibilities, for example, a court normally has no cause to consider its standard for adversity; the relevant question in such cases is whether such patently adverse action actually took place."  *Doe v. Dekalb County School Dist*, 145 F.3d 1441, 1448 (11th Cir. 1998) (citing *Eskra v. Provident Life and Accident Ins. Co.*, 125 F.3d 1406, 1412 (11th Cir. 1997) (considering a reduction in income, but not mentioning the plaintiff's subjective preferences, when ruling that a transfer was adverse)).  The *Doe* Court elaborated on "loss of prestige" as an "adverse" employment action in a subsequent footnote, saying that "loss of prestige, either within an organization or with regard to the general public, is an objective factor that a court should consider as part of the reasonable person test.  Beyond the loss of prestige itself (a reasonable if egoistic employee goal much like salary or promotion), diminishment of prestige may also affect an employee's marketability, another significant objective factor."  *Doe*, 145 F.3d at 1452 n.19 (citing *de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Serv.*, 82 F.3d 16, 21 (2d Cir. 1996)).

Plaintiff's discrimination and retaliation claims *appear* to be based on a litany of employment actions that she *perceived* as "adverse" (although it is arguable whether a reasonable person in the same circumstances would have considered the ction to be such).  In any event, however, plaintiff's Third Amended Complaint and her three briefs do little to specify the precise conduct that allegedly had a tangible, negative effect on plaintiff's employment.  Thus, the court was forced to turn to plaintiff's numerous EEO Complaints in an effort to discern what actions plaintiff contends to have been sufficiently "adverse" to become actionable under the federal employment discrimination statutes.

In tht regard, plaintiff complains about the following events in her various EEO Complaints: (1) she was suspended for two days in 2010;[263] (2) she was suspended for five days in 2011;[264] (3) she was suspended for twelve days in 2012;[265] (4) she was not selected for the Director of the Simulation and Analysis Directorate position in January of 2008;[266] (5) she was not selected for Chief of the Models & Simulations Division position in January of 2009;[267] (6) she was not selected for the GS-15

---

[263] Ex. 63 (EEO Decision).

[264] Ex. 65 (EEO Decision).

[265] Ex. 67 (EEO Decision).

[266] Ex. 45 (EEO Decision), at 3852.

[267] *Id.* at 3857.

Supervisory Operations Research Analyst position in June of 2009;[268] (7) she was not selected for Chief of the Models & Simulations Division position in November of 2010;[269] (8) her 2007-2008 performance award was the lowest in the division when compared to her counterparts at the same grade level;[270] (9) she was unfairly rated on her 2008-2009 performance evaluation;[271] (10) she was given an unjust performance evaluation rating and award for 2009-2010;[272] (11) she was given an unjust performance evaluation and award for 2010-2011;[273] (12) her research efforts were not properly funded;[274] (13) her funding was discontinued on one of her projects;[275] (14) management held unusual counseling sessions on April 16 and May 20, 2009;[276] (15) Dr. Steven Pierce denied her request for a team-building exercise;[277] (16) Jim Watkins invited another manager, Dr. Claudette Owens, to sit in on a performance standard review;[278] (17) she was required to include her supervisor on emails;[279] (18)

---

[268] *Id.* at 3853.

[269] Ex. 113 (EEO Decision).

[270] Ex. 45 (EEO Decision), at 3858.

[271] *Id.* at 3854.

[272] Ex. 88 (EEO Decision).

[273] Ex. 67 (EEO Decision).

[274] Ex. 45 (EEO Decision), at 3853.

[275] *Id.* at 3857.

[276] *Id.* at 3853.

[277] *Id.*

[278] *Id.* at 3854.

[279] *Id.*

her security clearance was suspended;[280] (19) she was not appointed to the Warfighter Selection Board;[281] (20) she was not assigned as an Acting Division Chief on several occasions;[282] (21) Fox's Letter of Concern;[283] (22) Dr. Pierce counseled plaintiff about her behavior;[284] (23) supervisors high in the chain of command did not attempt to stop discrimination or retaliation;[285] (24) Dr. Pierce did not approve her timecard in November of 2008;[286] and (25) management officials "diminished her concerns about Mr. Steve Fox," nitpicked her activities, and postponed her training.[287]

### 1.   *Prima facie* **case of discrimination under the Rehabilitation Act**

The Rehabilitation Act generally prohibits any program or activity receiving federal funds from discriminating against otherwise qualified individuals with a disability.  *See*, *e.g.*, *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *see also* 29 U.S.C. § 794(d).  Because the Rehabilitation Act shares a liability standard with the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), claims under the Rehabilitation Act are evaluated in the same manner as

---

[280] Ex. 45 (EEO Decision), at 3854.

[281] *Id.* at 3855.

[282] *Id.* at 3856-57; Ex. 88 (EEO Decision), at 4040.

[283] *See* doc. no. 53 (First Brief in Opposition to Summary Judgment); at 133.

[284] Ex. 45 (EEO Decision), at 3857.

[285] *Id.*

[286] *Id.* at 3858.

[287] *Id.* at 3852.

those under the ADA, including use of the *McDonnell–Douglas* burden-shifting framework for claims that rely upon circumstantial evidence.  *See*, *e.g.*, *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005); *Collado v. United States Postal Service Co.*, 419 F.3d 1143, 1149-50 (11th Cir. 2005).

To establish a *prima facie* case, plaintiff must show:  (1) that she has a disability; (2) she was otherwise qualified for the position — meaning that she could perform the essential functions of the employment position she sought or held, with or without reasonable accommodation being made by the employer; and (3) that she suffered an adverse employment action because of her disability.  *See*, *e.g.*, *Mullins*, 228 F.3d at 1313 (alteration supplied).  The Rehabilitation Act defines the concept of "disability" to include any individual who:

> (I) has a physical or mental impairment which substantially limits one or more of such person's major life activities;
>
> (ii) has a record of such an impairment; or
>
> (iii) is regarded as having such an impairment.

29 U.S.C. § 705(20)(B).  A person is regarded as having an "impairment" if she:

> is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity.  Prohibited actions include but are not limited to refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any

other term, condition, or privilege of employment.

29 C.F.R. § 1630.2(l).

Plaintiff admits that she "has never claimed to have a disability," but she contends that Steve Fox falsely portrayed her as disabled in his "Letter of Concern," which noted that she was taking medication for a ten-year-old head injury, and requested that she "seek an evaluation from the Employee Assistance Program on Redstone Arsenal."[288]   That Letter, however, does not state that plaintiff was "disabled," and she offers no other evidence that anyone at the Arsenal perceived her as disabled.

Fox's knowledge that plaintiff was taking medication, and his inquiry into her head injury, do not establish that he *perceived* her as disabled.  The record establishes that it was *plaintiff* who brought her head-injury to Fox's attention, and his efforts to determine whether she was impaired as a result of that injury does not establish that he perceived her as disabled.  Fox "did what an employer committed to meeting his [Rehabilitation Act] responsibilities in good faith would do:  [He] sought to open a dialogue with [plaintiff] and obtain further, accurate information regarding [her] condition so that [he] could craft an appropriate accommodation."  *Haulbrook v. Michelin North America*, 252 F.3d 696, 704 (4th Cir. 2001) (alterations supplied).

---

[288] Ex. 1, GX 24 (Letter of Concern); Ex. 152 (Fox's Testimony), at 9032.

## 2.   *Prima facie* elements of Title VII discrimination and retaliation claims

Disparate treatment on the basis of some protected characteristic and retaliation for protected conduct  are separate violations of Title VII.  *See Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).  To show an adverse employment action in the context of a disparate treatment claim, an employee must demonstrate "a *serious and material* change in the terms, conditions, or privileges of employment.  Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original).

Title VII imposes a lighter burden upon a retaliation claim:  "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006) (emphasis and alterations supplied) (internal quotation marks omitted).  "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or

78

minor annoyances that often take place at work and that all employees experience." *Id.* The *Burlington Northern* decision broadened the type of employer conduct that is actionable in a retaliation claim "from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff. . . . This more liberal view of what constitutes an adverse employment action accords an employee protection from a wider range of retaliatory conduct." *Crawford v. Carroll*, 529 F .3d 961, 973-74 (11th Cir. 2008).

Even under *Burlington Northern*'s broader definition of "adverse employment actions," many of the events complained of by plaintiff, regardless of whether they are considered individually or collectively, are not actionable. For example, the "unusual" counseling sessions on April 16 and May 20, 2009, Jim Watkins's invitation to Dr. Claudette Owens to sit in on plaintiff's performance counseling, the requirement that she include her supervisor on emails, Dr. Pierce's behavioral counseling sessions, and the purported "nitpicking," all fall squarely in the *trivial*, as opposed to *significant*, harm category that the Supreme Court cautioned courts to refrain from characterizing as "materially adverse." *Burlington Northern*, 548 U.S. at 68. Thus, it is clear that plaintiff's claims cannot proceed with regard to the actions described above.

Although this court is hesitant to believe that plaintiff can establish an

79

appropriate comparator, or a causal connection between her protected expression and each of the remaining adverse employment actions, defendant articulated a legitimate, nonretaliatory reason for each action, as demonstrated in the following table.

| Employment Action | Defendant's Articulated Reason |
|---|---|
| Two-Day Suspension | Plaintiff's disrespectful behavior to her supervisor, Jim Watkins, on July 21, 2009.[289] |
| Five-Day Suspension | Plaintiff's disrespectful behavior to her third-line supervisor, Colonel Bill Whitney, on November 3, 2010.[290] |
| Twelve-Day Suspension | Plaintiff's disrespectful behavior to her supervisor, Dr. Steven Pierce, on November 8, 2011, and her lack of candor.[291] |
| 2007-2008 Performance Award | Plaintiff's $1,700 performance award was based entirely on her type of work performed, difficulty of the tasks, and contributions to the organization.  Further, plaintiff's award was consistent with the three other GS-14s under Dr. Steven Pierce's supervision, who received performance awards of $1,700, $1,800, and $2,500.[292] |
| 2008-2009 Performance Evaluation and Award | Plaintiff received a 2-block rating because her performance and contributions met expectations, but did not exceed them, due to her disclosure of information, conduct during staff calls, and certain presentations. Her award was in line with other employees who received a 2-block rating.[293] |

---

[289] Doc. no. 40 (Brief in Support of Summary Judgment), at 21-24, ¶¶ 98-110.

[290] *Id.* at 24-26*,* ¶¶ 114-22.

[291] *Id.* at 26-28, ¶¶ 124-34.

[292] *Id.* at 30, ¶¶ 151-53.

[293] *Id.* at 31, ¶¶ 155-59.

| 2009-2010 Performance Evaluation and Award | Plaintiff received a 2-block rating because she never completed a "Roadmap" for Dr. Steven Pierce, failed to meet expectations on several deliverables, and failed to provide adequate information to Jim Watkins. Her award was in line with her prior award.[294] |
|---|---|
| 2010-2011 Performance Evaluation and Award | Plaintiff received a 2-block rating because she did not provide a strong demonstration of stakeholder coordination, failed to assist in duties while serving as an Acting Division Chief, did not exceed expectations with respect to a Models & Simulations "Roadmap," did not exceed management control objectives on multiple occasions, and did not exceed expectations to demonstrate a model or tool. Plaintiff's award was lower than normal due to new Department of Defense guidelines, but consistent with other GS-14s under plaintiff's supervisor, Kevin Crumlish.[295] |
| January 2008 Non-Selection for Director of the Simulations and Analysis Directorate | Dr. Steven Pierce was selected over plaintiff because he was more qualified for the position: he scored the highest after interviews, and he had a doctorate and supervisory experience. Plaintiff, on the other hand, had the fourth highest score after interviews, and lacked a doctorate and supervisory experience.[296] |
| January 2009 Non-Selection for Chief of the Models & Simulations Division | Only candidates who scored above a 60 were interviewed, and plaintiff scored below a 60. Jim Watkins was selected for the position after interviews because he scored the highest, and had a strong modeling and simulation background.[297] |

---

[294] *Id.* at 32, ¶¶ 161-65.

[295] Doc. no. 40 (Brief in Support of Summary Judgment), at 33-34, ¶¶ 168-73.

[296] *Id.* at 36-37, ¶¶ 184-91.

[297] *Id.* at 37-38, ¶¶ 194-200.

| | |
|---|---|
| June 2009 Non-Selection for a GS-15 Supervisory Operations Research Analyst Position | Colonel David Cox was selected for the position over plaintiff because he was more qualified: he scored the highest after interviews, had three years of supervisory experience, spent over two years directly advising a Senior Executive, and he had two years of experience managing the finances for an organization. Plaintiff, on the other hand, scored the sixth highest, and had little to no experience supervising, advising a Senior Executive, or managing the finances for an organization.[298] |
| November 2010 Non-Selection for Chief of the Models & Simulations Division | Kevin Crumlish was selected for the position over plaintiff because he was more qualified: he scored the highest after interviews, had a strong modeling and simulations background, and demonstrated success as the Program Manager of Extended Air Defense Simulations. Plaintiff, on the other hand, had the fourth highest score.[299] |
| Non-Appointments as Acting Division Chief | Appointments as Acting Division Chief were made based on time-in-grade, which placed plaintiff second in line for appointments behind John Morash.[300] |
| Non-Appointment for the Warfighter Source Selection Board | Plaintiff was not selected for the Warfighter Source Selection Board because all other Board members had more recent experience on the contract, and so an employee in the Models & Simulations Division could continue performing assigned work.[301] |

---

[298] *Id.* at 39-40, ¶¶ 202-12.

[299] *Id.* at 40-41, ¶¶ 214-21.

[300] *Id.* at 42, ¶ 230.

[301] Doc. no. 40 (Brief in Support of Summary Judgment), at 43-44, ¶¶ 237-39.

| | |
|---|---|
| Lack of Funding for Projects | Plaintiff experienced a lack of funding for her projects because all Models & Simulations Division programs were operating below the required levels of funding, and most of plaintiff's proposed projects were too expensive. Further, other GS-14s received lower than requested funds.[302] |
| Cancellation of Projects | One of plaintiff's projects naturally terminated, and Dr. Steven Pierce did not rate plaintiff on an objective related to her project that terminated.[303] |
| Steve Fox's Letter of Concern | The Letter of Concern was appropriate because plaintiff was insubordinate to her supervisor, Steve Fox. Fox had already drafted the Letter when plaintiff first complained about discrimination and retaliation.[304] |
| Delay in Approving Plaintiff's Timecard | Plaintiff, along with several other employees, received an email stating that her timecard was not yet in the system, and they needed to take action to ensure they would get paid. Management took action to address all timecard concerns and all employees were paid on time.[305] |
| Denial of Plaintiff's Team-Building Exercise | Dr. Steven Pierce denied plaintiff's team-building exercise because other employees expressed discomfort in the exercise, and there is no specific requirement to conduct a team-building exercise.[306] |

---

[302] *Id.* at 44-45, ¶¶ 241-45.

[303] *Id.* at 45, ¶¶ 246-47.

[304] *Id.* at 9-10, ¶¶ 32-36.

[305] *Id.* at 45, ¶ 250.

[306] *Id.* at 46, ¶¶ 253-54.

83

| | |
|---|---|
| Postponement of Plaintiff's Training | Plaintiff was already on a selection committee at the time she was notified that her application to attend a training course had been granted. The selection committee was a priority, and took precedence over the training course, which was only postponed. Plaintiff took the training course less than a year later.[307] |
| High-Level Supervisors Ignored Plaintiff's Complaints of Discrimination and Retaliation | Consistent with Department of Defense policy, Larry Burger, Lieutenant General Campbell, and Lieutenant General Fomica would refer plaintiff back to her chain of command, investigate the matter, or defer to the EEO process if she had already filed an EEO Complaint.[308] |

Accordingly, defendant met his burden of coming forward with legitimate, non-discriminatory, and non-retaliatory reasons for each of the employment actions complained of by plaintiff.

### 3.   Pretext

In order to show that the employer's stated reasons are merely a pretext for a discriminatory or retaliatory animus, a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (internal quotation marks omitted); *see also, e.g., Kragor v.*

---

[307] Ex. 153 (Dr. Pierce's Testimony), at 9079-86.

[308] Doc. no. 40 (Brief in Support of Summary Judgment), at 46-47, ¶¶ 256-58.

*Takeda Pharmaceuticals America, Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997); *Cooper–Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994).

Plaintiff only attempts to establish pretext for a few of the allegedly adverse employment actions she complains of.

She initially contends that defendant's articulated reason for Fox's Letter of Concern is pretextual based upon "Cp's Pre-Hearing Report."[309]  However, she does not provide a substantive argument in support of that assertion; indeed, she does not even explain to whom, or what, "Cp" refers.  Thus, plaintiff failed to meet her burden with regard to Fox's Letter.

Plaintiff also contends that defendant's proffered reason for postponing her training was pretextual because another employee was permitted to leave the selection committee on which she was forced to serve.[310]  However, Major Jason Conroy stated that the other employee was permitted to leave the selection committee because "[h]e had a personal — he had a medical — something in the family."[311]  That is a much more legitimate reason for seeking permission to leave the selection committee than

---

[309] Doc. no. 53 (First Brief in Opposition to Summary Judgment), at 133.

[310] *See* doc. no. 53 (First Brief in Opposition to Summary Judgment), at 134 (citing Ex. 158 (Colonel Conroy's Testimony), at 9315).

[311] Ex. 158 (Colonel Conroy's Testimony), at 9315 (alteration supplied).

a training class that can be rescheduled.  Put simply:  that fact does not establish any weaknesses, implausibilities, inconsistencies, or contradictions in defendant's proffered reason for postponing plaintiff's training class.

Plaintiff next contends for a variety of reasons that defendant's stated grounds for selecting Dr. Steven Pierce to be Director of the Simulations and Analysis Directorate are suspect.  The court disagrees.  First, plaintiff relies on several exhibits that she did not attach to the record, such as an email, a selection memorandum, her 2006-2007 performance evaluation, and a "Pre-Hearing Report."[312]  Second, she cites portions of her 2005-2006 performance evaluation for the proposition that she had supervisory experience, but the evaluation only states that plaintiff managed certain projects.[313]  It mentions nothing about supervising other employees.  Even if it is assumed that she did so, there is no basis provided to compare plaintiff's "management" experiences to Dr. Pierce's supervisory roles.   Third, plaintiff contends that the selection panel gave conflicting information as to what scores were

---

[312] *See* doc. no. 53 (First Brief in Opposition to Summary Judgment), at 134 (citing to Exhibits 191 and 194).  In all, plaintiff purports to attach Exhibits 171 through 238.  *See* doc. no. 54-1 (Table of Contents).  However, her submission is missing Exhibits 171-179, 190, 191, 194, and 195-199; only includes cover pages for Exhibits 187 and 213; mislabeled Exhibit 209 as Exhibit 199; and included Exhibit 210 twice.  *See* doc. nos. 54-2, 54-3, 54-4, 54-5, 54-6, 54-7 (Plaintiff's Attached Exhibits).  Defendant attached Exhibits 175 and 176 with his reply submission.  *See* doc. nos. 73-1 (Watkins's Testimony); 73-2 (Fox Email).

[313] *See* Ex. 221 (2005-2006 Performance Evaluation).

actually assigned to each applicant.[314]  Plaintiff relies on scorecards obtained during discovery.  However, the scorecards are illegible, and the court cannot consider them.[315]  Fourth, plaintiff contends that Dr. Pierce was reprimanded by a General Officer for abuse of subordinates.[316]  Nowhere in the exhibit to which plaintiff cites, however, does it state that Dr. Pierce received any formal reprimand prior to being selected for the position.[317]  It appears that plaintiff is referring to Colonel Peter Cole's November 3, 2014 declaration as a "reprimand," which does not evidence pretext because it was executed on May 22, 2012 — four years after Dr. Pierce was selected for the contested position.[318]  For all of those reasons, plaintiff failed to establish that defendant's proffered grounds for selecting Dr. Pierce were pretextual.

Finally, plaintiff relies extensively on Colonel Cole's declaration for the proposition that Larry Burger formed a "wolf pack" to attack and destroy the careers of female and minority employees.[319]  Plaintiff's claims, however, are not founded on

---

[314] Doc. no. 53 (First Brief in Opposition to Summary Judgment), at 135.

[315] *See* Ex. 236 (Scorecards); doc. no. 54-7 (Exhibits 234-237), at ECF 23-39.

[316] Doc. no. 53 (First Brief in Opposition to Summary Judgment), at 135.

[317] *See* Ex. 186 (Colonel Cole's Declaration).

[318] *Id.* at 2595.

[319] *See* doc. no. 54-7, at ECF 44, ¶ 9.  Interestingly, plaintiff's former attorney of record once commented, "I have slowly come to the conclusion that Cole is a liar. [At] a minimum he has made a false declaration in Ms. Paschal's administrative EEO process.  His stories of 'daring do' rival the Buffett song 'Last Mango in Paris'."  Ex. 239 (Riggs Email).

87

a "pattern and practice" theory,[320] and her evidence that Mr. Burger used his "wolf pack" to retaliate against Linda Beach and Pam Caruso, female employees in the Future Warfare Center,[321] is not relevant to her claims of individual discrimination and retaliation.  Further, Colonel Cole's opinion that Larry Burger's "command influence" tainted Colonel William Whitney's investigation into plaintiff's sexual harassment complaints is "pure conjecture and speculation," and not evidence of retaliation or discrimination.[322]  *See Daniels*, 692 F.2d at 1324.  Thus, Colonel Cole's declaration does not demonstrate pretext on any of the allegedly tangible employment actions.

Because plaintiff does not attempt to refute any of defendant's other proffered reasons for the allegedly adverse employment actions identified in the table set out above, summary judgment is due to be granted in defendant's favor on plaintiff's discrimination and retaliation claims.

**D.    Retaliatory Hostile Work Environment**

The Eleventh Circuit recently recognized a cause of action for retaliatory hostile work environment under Title VII which can be established with evidence that

---

[320] Plaintiff's claims are not brought as a class action, as is required for a private litigant to maintain a "pattern or practice" theory of discrimination or retaliation.  *See Davis v. Coca–Cola Bottling Co.*, 516 F.3d 955, 969 (11th Cir. 2008).

[321] *See* doc no. 54-7, at ECF 44-45, ¶ 12-14.

[322] *See id.* at ECF 46-47, ¶ 20.

an employer's actions "were sufficiently severe or pervasive to alter the terms and conditions of employment, thus constituting an adverse employment action." *Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012) (*per curiam*).  In other words, when evaluating whether an employer's actions constitute an "adverse employment action" within the context of a claim of retaliatory hostile work environment, courts do not employ the standard typical of retaliation claims — *i.e.*, whether the employer's actions "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *See, e.g.*, *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006).  Instead, courts apply the "severe or pervasive" standard typical of hostile work environment claims.  *See, e.g.*, *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

A majority of the employment actions complained of by plaintiff, however, were not based upon retaliation for plaintiff's protected EEO activity.  Moreover, many of those employment actions constitute discrete acts, which "must be challenged as separate statutory discrimination and retaliation claims," and "cannot be brought under a [the rubric of a retaliatory] hostile work environment claim." *McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008) (alteration supplied). *See also Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 970 (11th Cir. 2008) (holding that "hiring decisions, light work assignments, and alleged retaliation

constituted discrete acts, not acts that were part of a hostile work environment");
*Abram v. Fulton County Government*, 598 F. App'x 672, 675 (11th Cir. Jan. 29, 2015) ("Discrete acts include 'termination, failure to promote, denial of transfer, or refusal to hire,' each of which is easy to identify.").  Thus, plaintiff's various non-selections, suspensions, and negative performance evaluations are more appropriately challenged as separate retaliation claims, rather than as part of a retaliatory hostile work environment claim.

This court has reviewed the record, and finds that the remaining conduct complained of by plaintiff — including the various counseling sessions, attendance of witnesses during performance reviews, her requirement to include her supervisor on emails, and the purported "nitpicking" — was not sufficiently severe or pervasive, either when considered individually or as a whole, to alter the terms and conditions of her employment.  Accordingly, summary judgment is due to be granted in defendant's favor on plaintiff's retaliatory hostile work environment claim.

## V.  CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment is due to be granted, and all claims of plaintiff dismissed.  A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

90

**DONE** and **ORDERED** this 22nd day of June, 2015.

United States District Judge

91

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **ALESYA M. PASCHAL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-12-S-2985-NE** |
| | ) | |
| **JOHN M. McHUGH,** | ) | |
| *Secretary of the Army*, | ) | |
| | ) | |
| **Defendant.** | ) | |

# EXHIBIT A



# ALABAMA STATE BAR

415 Dexter Avenue • Post Office Box 671 • Montgomery, Alabama 36101
Telephone: 334/269-1515 • Fax: 334/261-6310
www.alabar.org

*STATE OF ALABAMA*

*COUNTY OF MONTGOMERY*

    *I, Keith B. Norman, Secretary of the Alabama State Bar and custodian of its records, hereby certify that Howell Roger Riggs, Jr. has been duly admitted to the Bar of this State and, upon payment of the appropriate fees, would be entitled to practice in all of the courts of this State including the Supreme Court of Alabama, which is the highest court of said state.*

    *I further certify that Howell Roger Riggs, Jr. was admitted to the Alabama State Bar September 4, 1969.*

    *I further certify that Howell Roger Riggs, Jr. was placed on inactive status with the Alabama State Bar, and consequently not in good standing, as of January 5, 2015, having elected neither to meet the annual licensing requirements of Section 40-12-49, Code of Alabama, (1975) nor to become a special member pursuant to Sections 34-3-17 and 18, Code of Alabama, (1975).*

    *IN WITNESS WHEREOF, I have hereunto set my hand and the seal of the Alabama State Bar on this the 8th day of April, 2015.*

*Keith B. Norman, Secretary*





LAWYERS RENDER SERVICE